**In re Kevin PRESTO, Debtor.**

**No. 06–33618.**

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

Oct. 5, 2007.

556

David Nathan Ziegler, Attorney at Law, Houston, TX, Michael G. Colvard, Martin & Drought, P.C., San Antonio, TX, for Debtor.

Steven Douglas Shurn, Hughes Watters and Askanase, Houston, TX, for trustee.

Nancy Lynne Holley, U.S. Trustee, Houston, TX, for U.S. Trustee.

Anne E. Catmull, Charles Brittain Walther, McClain & Patchin, P.C., Houston, TX, for Plaintiffs.

### *MEMORANDUM OPINION ON OFFICIAL EMPLOYMENT–RELATED ISSUES COMMITTEE OF ENRON CORP.'S OBJECTIONS TO DEBTOR'S CLAIM OF THE HOMESTEAD EXEMPTION*

[Docket Nos. 25 and 107]

JEFF BOHM, Bankruptcy Judge.

## I. Introduction

Kevin Presto (the Debtor) was a vice-president at Enron North America Corporation prior to the monumental collapse and eventual bankruptcy of its parent company, Enron Corporation (Enron).[1] Sev-

---

1. The long and tortured tale of Enron has been well-documented in many sources. *See, e.g.,* BETHANY MCLEAN & PETER ELKIND, THE SMARTEST GUYS IN THE ROOM: THE AMAZING RISE AND SCANDALOUS FALL OF ENRON (2003); LYNN BREWER, HOUSE OF CARDS: CONFESSIONS OF AN ENRON EXECUTIVE (2002); KURT EICHENWELD, CONSPIRACY OF FOOLS (2005). Enron's unraveling merely provided the catalyst for the events which gave rise to this dispute, and an in-depth analysis of specific details is not necessary. For the purposes of this Memorandum Opin-

eral weeks before Enron filed its Chapter 11 case, the Debtor was among a number of Enron insiders who received lucrative bonus payments.[2] The Debtor's bonus was $2 million.

On December 2, 2001, Enron filed its Chapter 11 petition in the Southern District of New York, case no. 01–16034. The Official Employment–Related Issues Committee of Enron Corp. (the Committee) was created in the Enron bankruptcy case and assigned the right to prosecute avoidance actions against the recipients of these bonus payments. On December 9, 2005, the bonus payments were held to be fraudulent transfers, and a $2 million judgment was entered against the Debtor and in favor of the Committee (the Judgment).

During the four years it took for the Committee to obtain the Judgment, the Debtor spent or lost the entire $2 million bonus, which resulted in the filing of this Chapter 7 case on July 31, 2006.[3] Currently, the only significant asset remaining in the Debtor's estate is his homestead, which is worth over $500,000.00. On October 27, 2006, the Committee filed its Objection to Debtor's Claim of the Homestead Exemption [Docket No. 25], and subsequently the Committee filed its Supplemental Objection to Debtor's Claim of the Homestead Exemption [Docket No. 107] (collectively, the Objection).[4] The Objection presents three different objections under 11 U.S.C. § 522(*o*), (p), and (q), respectively [5]—all of which are new provisions added to the Code as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA).[6] As the objecting party, the Committee bears the ultimate burden of establishing that the Debtor's claimed homestead exemption is improper. Fed. R. Bankr.P. 4003(c); *In re Hill,* 310 B.R. 294, 296 (Bankr.W.D.La.2004). The Committee must establish that the exemption is improper by a preponderance of the evidence. *In re Park,* 246 B.R. 837, 840 (Bankr.E.D.Tex.2000).

Between April 4, 2007 and June 21, 2007, the Court held a total of eight hearings related to the Objection.[7] For the reasons set forth in this Memorandum Opinion, the Committee's Objection is sustained in part and overruled in part. A corresponding Order will be entered on the docket simultaneously with the entry of this Memorandum Opinion.

ion, a cursory understanding of the events surrounding the final days of Enron, which the Court assumes on the part of the reader, is more than adequate.

2. Enron's putative justification for these bonuses was the retention of key employees after a merger with Dynegy, Inc.—a merger which was never consummated.

3. Ironically, the Debtor sustained substantial losses as a result of ill-chosen investments in the energy industry—the same business as his former employer, Enron North America.

4. Unless otherwise noted, all references to docket numbers relate to the docket sheet in Case No. 06–33618.

5. At the beginning of trial, the Objection actually included five different theories: the above referenced three, plus two alternative theories, one under § 522(*o*) and one under § 522(p). The Court dismissed these latter two objections on the record in response to the Debtor's oral motion for judgment on partial findings pursuant to Fed.R.Civ.P. 52(c). Accordingly, these theories are outside of the scope of this Memorandum Opinion, but will be addressed briefly where relevant.

6. Unless otherwise noted, all section references refer to 11 U.S.C. and all references to the "Code" or the "Bankruptcy Code" refer to the United States Bankruptcy Code.

7. Several of these hearings were dedicated to the cross motions for summary judgment filed by the Debtor and the Committee as well as a motion in limine filed by the Committee.

## II. Jurisdiction and Venue

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. §§ 157(b)(2)(A), (B), and (O). This contested matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), and (O). Venue is proper pursuant to 28 U.S.C. § 1408(1).

## III. Standing[8]

■ The Debtor argues that the Committee lacks standing to file this Objection because it was merely assigned the right to prosecute and recover a judgment against the Debtor in the Enron bankruptcy case, but was never actually assigned the Judgment itself and therefore is not a creditor of the Debtor. The Court finds that the Committee has standing for two reasons: (1) the Debtor's argument misconstrues the requirements of standing to file an objection to exemption; and (2) the Debtor is estopped from denying that the Committee is the holder of the claim based on the Judgment.

■ First, the argument by Debtor's counsel implies that a party *only* has standing to file an objection to exemption if it is a creditor of the estate. While it is true that every creditor has standing to object, it is incorrect to say that a party *must* be a creditor to object to a claimed exemption. Bankruptcy Rule 4003(b) states that any "party in interest may file an objection" to a debtor's list of exempt property. Although it is used several times throughout the Code, the phrase "party in interest" is not a defined term. The Fifth Circuit has broadly interpreted "party in interest" to include "any other person with a sufficient stake in [the] outcome of a proceeding so as to require representation." *Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana,* 347 F.3d 589, 595 (5th Cir.2003) (citing *In re Am. Appliance,* 272 B.R. 587 (Bankr. D.N.J.2002)). The Judgment is by far the Debtor's single largest unsecured debt, and the Committee is the eventual recipient of any proceeds recovered from that claim through the terms of the Enron Plan. Thus, the Court finds that the Committee is a party in interest and therefore has standing to file this Objection.[9]

8. The Debtor first challenged the standing of the Committee to file its Objection in his motion for summary judgment. [Docket No. 128.] In its order denying all motions for summary judgment, the Court determined that the Committee had standing. [Docket No. 151.] However, at the commencement of the hearing on the merits of the Objection, Debtor's counsel, wanting to avoid at all costs the risk of opposing counsel subsequently arguing that he had waived this legal issue on appeal, requested that he be allowed to argue this point again. The Court granted this request.

9. A brief summary of the origin and authority of the Committee may be helpful to understanding the Committee's status as a party-in-interest. On August 28, 2002, the court in the Enron bankruptcy case entered an Order of Final Approval Approving Settlement of Severance Claims of Similarly–Situated Claimants and Authorizing the Official Employment–Related Issues Committee to Commence Certain Avoidance Actions on Behalf of Estates (the Settlement Order). [Docket No. 128, Ex. 1.] The Settlement Order authorized the Committee to "prosecute, settle, and release" the Avoidance Actions. [Docket No. 128, Ex. 1, pg. 15.] The Settlement Order was later clarified by a subsequent order on May 12, 2003. This clarifying order states that the powers to "prosecute, settle, and release" which were granted to the Committee in the Settlement Order included the right to recover proceeds of the avoidance actions [Docket No. 128, Ex. 4.]

The defendants in the avoidance actions (i.e. Presto and the other recipients of the bonus payments) challenged the validity of this Settlement Order and claimed that Enron improperly transferred the avoidance claims to the Committee. The court in the avoidance actions interpreted the Settlement Order as

■ Second, the Court finds that the Debtor is judicially estopped from denying that the claim arising from the Judgment belongs to the Committee. *In re Sissom*, 366 B.R. 677, 697 (Bankr.S.D.Tex.2007) (citing *Larson v. Groos Bank, N.A.*, 204 B.R. 500, 501 (W.D.Tex.1996); *Jacobson v. Ornsby (In re Jacobson)*, No. 04–51572, 2006 WL 2796672, at *17, 2006 U.S. Dist. LEXIS 70433, at *54 (W.D.Tex. Sept. 26, 2006)). On March 28, 2007, the Committee filed a proof of claim against the Debtor's estate. [Claim No. 5.] The Debtor did not file an objection to the Committee's claim. The Debtor filed a Schedule F on three different occasions—the original Schedule F on July 31, 2006 [Docket No. 1, p. 20], an amended Schedule F on October 13, 2006 [Docket No. 20], and a second amended Schedule F on December 7, 2006. [Docket No. 59.] In each of these three Schedules, the Debtor listed the Committee as the name of the creditor holding the Judg-

ment. The Schedules do not try to qualify the debt by indicating either that it is disputed or including such language as "on behalf of Enron Corp." Thus, the first time that the Debtor asserted that the debt was not owed to the Committee was in his motion for summary judgment. Accordingly, the Court finds that the Debtor is judicially estopped from denying that the Committee holds a valid claim based on the Judgment.

## IV. The Committee's Objection under 11 U.S.C. § 522(*o*)

### A. Introduction

Shortly before filing his Chapter 7 petition, the Debtor sold his previous homestead and purchased his current homestead. Since the Debtor moved to a less expensive home, this transaction left the Debtor with over $150,000.00 in cash. The

follows: "[T]he debtors and its [creditors'] committee agreed that the Employment Committee would prosecute certain avoidance actions as representative of the estates and for the benefit of the estates. However, they further agreed that the net proceeds, if any, from the avoidance litigation would be distributed to the settling employees in accordance with the terms of the settlement agreement. The agreement provides that the settling employees would be eligible to receive a *pro rata* distribution from any recovery from the avoidance litigation. The court's order entered August 28, 2002 recognized and approved the assignment of the net proceeds of the litigation to the settling employees." *Official Employment–Related Issues Comm. of Enron Corp. v. Lavorato (In re Enron Corp.)*, 319 B.R. 128, 133 (Bankr.S.D.Tex.2004). The court in *Lavorato* then noted that such an assignment of litigation proceeds away from the estate to one creditor (i.e. the Committee) was inconsistent with § 550(a), which requires that the recovery become property of the estate. *Lavorato*, 319 B.R. at 133. Since the proceeds become part of the estate pursuant to § 550(a), the terms of the plan determine the specific distribution of any judgment proceeds. "The plan identifies a settlement

fund trust governed by a trust agreement to be funded by any recovery from the avoidance claims and distributed to the settling employees as beneficiaries." *Lavorato*, 319 B.R. at 134. The court concluded that "the committee recovers a judgment for the benefit of the estate under § 550(a) and the plan, as confirmed by court order, directs its distribution. As a result, the committee may recover a judgment for the benefit of the estate under § 550(a)." *Lavorato*, 319 B.R. at 134.

This Court agrees with the *Lavorato* court's synthesis of the Settlement Order and the Enron Plan. The Settlement Order authorized the Committee to prosecute the avoidance actions and recover judgments *on behalf of* the Enron estate. Those funds would become part of the estate and then be distributed pursuant to the terms of the confirmed Chapter 11 Plan. The Enron Plan creates a trust for the proceeds of the avoidance actions. The members of the Committee are the beneficiaries of this trust. The Debtor's argument against the Committee's standing is that this relationship, whereby the proceeds must pass through the Plan before reaching the Committee members, establishes standing only in the reorganized Enron as the true owner of the claim. The Court disagrees.

Committee's Objection under § 522(*o*) is premised on the theory that the Debtor intentionally spent these proceeds on improvements to his current homestead prior to filing bankruptcy in order to prevent the Committee from reaching these funds as a creditor in the impending bankruptcy.[10]

During the two-month period that hearings were held on the Committee's Objection, this Court issued a lengthy opinion regarding § 522(*o*). *In re Sissom,* 366 B.R. 677 (Bankr.S.D.Tex.2007). On the record, the Court made counsel for the Debtor and the Committee aware of the *Sissom* opinion. The parties were encouraged by the Court to structure the presentation of their cases in chief and their closing arguments to parallel the analysis of § 522(*o*) in *Sissom.* Accordingly, the Court adopts the discussion of § 522(*o*) found in *Sissom* and applies it to the case at bar.

### B. Findings of Fact

The facts relevant to the Committee's Objection under § 522(*o*) are as follows:

1. In January 2005, the Debtor paid attorney David Ziegler (Ziegler) a $35,000.00 retainer. Ziegler represented the Debtor in filing his Chapter 7 petition.

2. On December 5, 2005, the Judgment in the avoidance action was entered against the Debtor in the amount of $2 million. [Comm. Ex. 3–C.1 and 3–C.3] From this time up until shortly before the Debtor filed bankruptcy, the Committee and the Debtor were engaged in settlement negotiations.

3. On May 18, 2006, the Debtor sold his previous homestead, located at 5410 Morning Breeze, Houston, TX 77041 (the Morning Breeze Property), for $1,390,664.21. [Comm. Ex. 64.] After payment of liens on this property, the Debtor received $675,222.06. [*Id.*]

4. Also on May 18, 2006, the Debtor purchased his current homestead, located at 11939 Royal Rose Drive, Houston, TX 77082 (the Royal Rose Property), for $521,800.00. The Debtor paid the entire $521,800.00 purchase price out of the proceeds from the sale of the Morning Breeze Property.

5. On June 21, 2006, Ziegler and the Debtor had a telephone conversation about the possibility of the Debtor filing bankruptcy in the near future. Ziegler created three pages of handwritten notes during this conversation (the Ziegler Notes). [Comm. Ex. 3–A.11, pp. 29–31.][11]

---

10. As previously discussed in footnote 5, the Court dismissed another theory of the Committee under § 522(*o*) at the end of its case in chief upon the Debtor's oral motion for judgment on partial findings pursuant to Fed. R.Civ.P. 52(c). Under this theory, the Committee alleged that the $2 million bonus payment was nonexempt property and that construction of the previous homestead was an attempt to convert these nonexempt funds into an exempt homestead. The Court ruled, on the record, that the Committee had not presented sufficient evidence of fraudulent intent to support this objection.

11. The Ziegler Notes were the subject of the Committee's Motion in Limine. [Docket Nos. 156 and 157.] The Debtor objected to admission of the Ziegler Notes on the basis of the attorney-client privilege. The Court admitted the Ziegler Notes upon finding that the privilege had been waived because the Debtor had disclosed the Notes to the Committee during discovery and had not shown that procedures were in place to prevent disclosure, or that any attempt was made to seek return of the documents after their disclosure was uncovered. *Alldread v. City of Grenada,* 988 F.2d 1425, 1433 (5th Cir.1993); *see also Myers v.*

6. The Ziegler Notes read, in pertinent part, as follows:

"8,000—Shutter

22,000—Closets/Built Ins

15,000—wood floors, paint, HVAC

90,000—pool (30k prepaid)

25,000—furn./TVs

. . .

(20k left)—Summer camps, seaworld

. . .

Paper Trail

. . .

Prior to filing—accept 20k or file.

. . .

Have pool paid & completed before filing"

[Comm. Ex. 3–A.11, pp. 29–30.]

7. On July 7, 2006, the Debtor made a final offer of $20,000.00 to settle the Committee's $2 million judgment.

8. In July 2006, the Debtor spent more than $2,000.00 on a trip to SeaWorld with his children, which included $1,550.00 for three nights in a resort hotel.

9. On July 31, 2006, the Debtor filed his Chapter 7 petition. [Docket No. 1.]

10. The Debtor's Schedule A, filed with his petition on July 31, 2006, states that the value of the Royal Rose Property is $550,000.00. [Docket No. 1.]

11. The Debtor testified that he believed the current market value of his house was $521,800.00, which was the purchase price and also the 2006 tax appraisal by the Harris County Appraisal District.

12. The Debtor spent no less than $119,102.08 on the following improvements to the Royal Rose Property:

| Date 12 | Vendor | Service | Cost | Citation |
| --- | --- | --- | --- | --- |
| 5/19 | Traditional Design | Hardwood Floors | $ 5,451.08 | Comm. Ex. 3–A.1 1, p. 11 |
| 5/25 | Houston Shutters | Shutters | $ 7,116.00 | Comm. Ex. 3–A.11, p. 10 |
| 5/27 | Molina Construction | Paint/Labor | $ 12,000.00 | Comm. Ex. 3–A.11, p. 12 |
| 5/30 | Space Man | Cabinets | $ 12,860.00 | Comm. Ex. 3–A.11, p. 13 |
| 6/17 | Space Man | Cabinets | $ 9,475.00 | Comm. Ex. 3–A.11, p. 14 |
| 6/1–15 | Mike Lykke | Pool | $ 25,000.00 | Comm. Ex. 12; Docket No. 76 |
| 6/20 | Mike Lykke | Pool | $ 30,000.00 | Comm. Ex. 12; Docket No. 76 |
| Jul. | Mike Lykke | Pool | $ 10,000.00 | Comm. Ex. 12; Docket No. 76 |
| Aug. | Mike Lykke | Pool | $ 7,200.00 | Comm. Ex. 12; Docket No. 76 |
| | | Total: | $119,102.08 | |

13. The Debtor testified that all these improvements were paid for with funds remaining from the sale of the Morning Breeze Property.

14. The Debtor's original Statement of Financial Affairs did not disclose any of the payments made for the improvements to the Royal Rose Property. [Docket No. 1.] The Debtor testified that his failure to disclose these payments was based on the advice of his counsel that they were transfers in the ordinary course of business.

15. The Debtor's amended Statement of Financial Affairs of December 7, 2006 [Docket No. 59] includes the payments for the improvements,

*City of Highland Village,* 212 F.R.D. 324, 327 (E.D.Tex.2003).

12. All dates represent the year 2006. Where only the month is shown, there is no evidence regarding the specific date.

but this amendment occurred after the Committee had already informed the Debtor of his failure to disclose. [Comm. Ex. 3–A.10.]

## C. Conclusions of Law

Section 522(*o*), in pertinent part, states that:

[T]he value of an interest in—

(1) real or personal property that the debtor or a dependent of the debtor claims as a residence; [or]

. . .

(4) real or personal property that the debtor or a dependent of the debtor claims as a homestead

. . .

shall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10–year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt, or that portion that the debtor could not exempt, under subsection (b), if on such date the debtor had held the property so disposed of.

■ There are four elements to establishing an objection under § 522(*o*): (1) the debtor disposed of property within the 10 years preceding the bankruptcy filing; (2) the property that the debtor disposed of was nonexempt; (3) some of the proceeds from the sale of the nonexempt property were used to buy a new homestead, improve an existing homestead, or reduce the debt associated with an existing homestead; and (4) the debtor disposed of the nonexempt property with the intent to hinder, delay or defraud a creditor. *Sissom*, 366 B.R. at 688.

1. **The Debtor made the improvements to the Royal Rose Property within 10 years of filing his bankruptcy petition.**

The Debtor purchased the Royal Rose Property on May 18, 2006. All of the improvements to this property occurred between that date and the time that the Debtor filed his Chapter 7 petition on July 31, 2006. Thus, the first element is satisfied.

2. **The Debtor made the improvements to the Royal Rose Property with the proceeds remaining from the sale of the Morning Breeze Property, and those proceeds were nonexempt.**

■ On May 18, 2006, the Debtor sold his prior homestead, receiving $675,222.06 in cash, and immediately purchased his current homestead for $521,800.00. This transaction left the Debtor with $153,422.06 in cash proceeds. Under Texas law, all of the equity that was transferred from the prior homestead into the current homestead maintained its exempt status. Texas law provides a six-month window during which proceeds from the sale of a homestead continue to be exempt despite not being invested in any homestead. TEX. PROP.CODE ANN. § 41.001(c) (Vernon 2006). The policy behind the statute is to protect homestead equity so that it may be reinvested into another homestead. *In re Zibman*, 268 F.3d 298, 305 (5th Cir.2001); *Hill v. Jones (In re Jones)*, 327 B.R. 297, 302 (Bankr.S.D.Tex.2005). The Debtor argued that all of the improvements to the Royal Rose Property occurred within six months of its purchase, and the funds, therefore, never lost their exempt status.

■ The Debtor is incorrect because the six-month grace period is not absolute. "[I]f the debtor purchases a new home-

stead any remaining proceeds from the sale of the first homestead are instantly rendered non-exempt." *In re Davis,* 170 F.3d 475, 483 n. 10 (5th Cir.1999); *see also In re England,* 975 F.2d 1168, 1174 (5th Cir.1992) ("the acquisition of another homestead during that six month period instantly changes the prior homestead to *former* homestead and deactivates the proceeds exemption statute such that the proceeds of the former homestead are no longer exempt."). When the Debtor purchased the Royal Rose Property, the $153,422.06 in proceeds remaining from the sale of the Morning Breeze Property were rendered nonexempt. Thus, the second element of § 522(*o*) is satisfied.

### 3. The Committee established that the Debtor used nonexempt property to pay for the improvements to the Royal Rose Property.

In the case at bar, the Debtor does not dispute that the proceeds from the sale of the Morning Breeze Property were the sole source of funds used to build the pool and other improvements at the Royal Rose Property. Thus, the third elements is satisfied.

### 4. The Debtor acted with intent to delay, hinder, or defraud by spending all of the Morning Breeze Property proceeds on improvements to the Royal Rose Property.

█ Under § 522(*o*), the intent to hinder, delay, or defraud is similar to the burden under §§ 727 and 548. *Sissom,* 366 B.R. at 692. The moving party may either present direct testimony of the wrongful intent, or indirectly show intent through the badges of fraud from the Texas Uniform Fraudulent Transfer Act. The Committee presented both direct and indirect evidence of the Debtor's fraudulent intent.

### a. The Committee's direct evidence of fraud

The Committee's sole piece of direct evidence is the handwritten notes of David Ziegler, the Debtor's bankruptcy counsel. According to the Committee, the Ziegler Notes consecrate a plan between Ziegler and the Debtor to consume all of the proceeds from the sale of the Morning Breeze Property before filing bankruptcy in order to prevent the Committee from recovering on the Judgment. The Court disagrees.

The Ziegler Notes do not conclusively show a plan being hatched to dissipate the nonexempt funds because it appears that the many of the expenditures on the list had already occurred before this conversation. Both Ziegler and the Debtor testified that this telephone conversation occurred on June 21, 2006. Only $17,200.00 of the improvements were paid for after this date and that amount was related to the pool, construction on which had started well before June 21, 2006. Thus, the Ziegler Notes, while raising suspicions about the Debtor's conduct, do not conclusively establish the formation of any wrongful intent on May 18, 2006, the date that the Debtor purchased the Royal Rose Property and the nonexempt funds were generated.

### b. The badges of fraud

█ The Committee also presented indirect evidence of the Debtor's intent through the badges of fraud. The Committee's theory is that the circumstances surrounding the May 18, 2006 sale of the Morning Breeze Property and the purchase of the Royal Rose Property support a finding that, as of that date, the Debtor developed the intent to deplete the sale proceeds in order to prevent the Committee from recovering on its judgment. Pur-

suant to the analysis in *Sissom*, the Court considers 13 potential badges of fraud:[13]

### i. The transfer or obligation was to an insider.

The transfers at issue are the payments for the improvements to the Royal Rose Property. Since the Debtor is the only person occupying the Royal Rose Property, the transfers were for his own benefit. Therefore, this badge of fraud is present.

### ii. The Debtor retained possession or control of the property after the transfer.

The Debtor is currently residing at the Royal Rose Property and enjoying the benefit of the improvements. Since the Royal Rose Property is still his homestead and sole residence, this badge of fraud is present.

### iii. The transfer or obligation was concealed.

The Debtor's original Statement of Financial Affairs, filed along with his petition on July 31, 2006, did not disclose any of the payments made for the improvements to the Royal Rose Property. The Debtor testified that he disclosed these payments to his attorney, Mr. Ziegler, who advised him that the payments did not need to be listed in the Statement of Financial Affairs because they were transfers made in the ordinary course of business. Several months later, on December 7, 2006, after the Debtor had engaged his current co-counsel, Mr. Colvard, the Debtor filed an amended Statement of Financial Affairs that disclosed the transfers. The tardiness of this disclosure does not cure the Debtor's prior failure to disclose. During the intervening months, the Committee, through its own investigation and review of documents, had become aware of the improvements and informed the Debtor in writing of his failure to disclose. *See Superior Crewboats, Inc. v. Primary P & I Underwriters (In re Superior Crewboats Inc.)*, 374 F.3d 330, 336 (5th Cir.2004) (quoting *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1288 (11th Cir.2002)) ("Allowing [the debtor] to back-up, re-open the bankruptcy case, and amend his bankruptcy filings, only after his omission has been challenged by an adversary, suggests that a debtor should consider disclosing personal assets only if he is caught concealing them.") Thus, the Court finds this badge of fraud is present.

### iv. Before the transfer was made or obligation incurred, the Debtor had been sued or threatened with suit.

The Committee filed suit against the Debtor to recover the bonus payment several years before the Debtor filed this Chapter 7 petition. This lawsuit had been reduced to a judgment on December 5, 2005, before the improvements were made. Thus, the Court finds that this badge of fraud is present.

### v. The transfer was of substantially all the Debtor's nonexempt assets

On the petition date, according to the Debtor's own schedules, the Debtor had $400.00 cash on hand and $1,318.00 in a checking account. [Docket No. 1, Schedule B.] The improvements to the Royal Rose Property cost at least $119,102.08—an amount vastly larger than the cash assets on the petition date.[14] Accordingly, this badge of fraud is present.

---

13. The first ten badges of fraud discussed in *Sissom* appear in the Texas Uniform Fraudulent Transfer Act. TEX. BUS. & COM.CODE ANN. § 24.005(b) (Vernon 2006).

14. The Court is not taking the Debtor's exempt assets into consideration under this badge of fraud.

### vi. The Debtor absconded—i.e., avoided service of process and/or concealed himself.

No facts were presented to suggest that the Debtor absconded or concealed himself in any way. Therefore, this badge of fraud is not present.

### vii. The Debtor removed or concealed assets

The Debtor concealed the existence of a tax refund check.[15] This act serves as the basis of the Committee's Objection under § 522(q), discussed in considerable detail below. Therefore, this badge of fraud is present.

### viii. The value of the consideration received by the Debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

No facts were presented to suggest that the improvements made by the Debtor were for less than reasonably equivalent value. Therefore, this badge of fraud is not present.

### ix. The Debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

The nonexempt cash used to fund the improvements was the Debtor's only liquid asset. According to the Debtor, at the time he filed his petition, he had $400 cash on hand and $1,318.00 in a checking account. [Docket No. 1, Schedule B.] He had negative monthly income of $3,326.00.

[Docket No. 1, Schedule J.] The Debtor's summary of schedules states that he had total assets of $571,018.00 and total liabilities of $2,505,905.00. [Docket No. 1, Summary of Schedules.] The Debtor became insolvent as of the entry of the $2 million Judgment on December 5, 2005. Therefore, all of the improvement made between May 18, 2006 and July 31, 2006 occurred at a time when the Debtor was insolvent. Accordingly, this badge of fraud is present.

### x. The transfer occurred shortly before or shortly after a substantial debt was incurred.

As stated above, the Committee's Judgment against the Debtor was entered on December 5, 2005. The Debtor began the improvements approximately five months later. The Court believes that this five-month period is sufficiently short, especially in light of the size of the Judgment and the fact that the Debtor was insolvent at that time, to conclude that this badge of fraud is present.

### xi. The transfer was done just prior to the filing of the Debtor's bankruptcy petition.[16]

The Debtor purchased the Royal Rose Property on May 18, 2006 and made all of the improvements shortly thereafter. The Debtor filed his Chapter 7 petition on July 31, 2006. Therefore, this badge of fraud is present.

### xii. The Debtor is unable to explain the disappearance of assets.[17]

No facts were presented about the Debtor's inability to explain the disappearance

15. Although the tax refund is a separate issue from the improvements to the Debtor's homestead, the Court believes that the concealment of *any* assets is relevant to this badge of fraud.

16. This badge of fraud does not appear in TUFTA. It originally appeared in *In re Lacounte*, 342 B.R. 809, 816 (Bankr.D.Mont.

2005). This Court is persuaded that it should include this particular badge of fraud in its analysis.

17. This badge of fraud does not appear in TUFTA. It originally appeared in *Lacounte*, 342 B.R. at 815. This Court is persuaded that

of assets. Therefore, this badge of fraud is not present.

### xiii. The Debtor has engaged in a pattern of "sharp dealing" prior to bankruptcy.[18]

In *Sissom*, this Court defined "sharp dealing" to mean "unethical action and trickery." *Sissom*, 366 B.R. at 700, n. 34. On July 7, 2006, the Debtor made a final settlement offer to the Committee. The Debtor offered $20,000.00 as settlement of the Committee's $2 million judgment. In the two months prior to this offer, the Debtor spent no less than $119,102.08 on improvements to his homestead. Additionally, in July 2006 (i.e., approximately the same time as the settlement offer), the Debtor spent over $2,000.00 on a trip to SeaWorld with his children, which included spending $1,550.00 on hotels for three nights. The Court finds that the Debtor's use of the nonexempt funds prior to bankruptcy and his conduct while negotiating with the Committee constitutes sharp dealing.

### xiv. A sufficient number of badges of fraud are present to infer fraudulent intent.

The Court finds that nine of the thirteen badges of fraud are present in the case at bar. The Court considers more than merely the numerical majority of badges. In weighing each badge of fraud, the Court is particularly troubled by the convenient timing and conspicuous nondisclosure of the Debtor's improvements to his homestead. Accordingly, the Court finds that the Committee has established the Debtor's fraudulent intent.

### 5. Calculation of the Non–Exempt Portion of the Royal Rose Property Under § 522(o)

Simply because the Committee has established all of the elements under § 522(o) does not mean that the relief to which it is entitled should be the full amount spent on the improvements to the Royal Rose Property. The scope of the statute is limited to the value in a debtor's homestead that is "attributable" to nonexempt property that was fraudulently converted into equity in the homestead. The Committee bears the burden of establishing a current market value in excess of the $521,800.00 purchase price in order to show by what amount the improvements made by the Debtor actually increased the value of the Royal Rose Property.[19]

---

it should include this particular badge of fraud in its analysis.

18. This badge of fraud does not appear in TUFTA. It originally appeared in *In re Agnew*, 355 B.R. 276, 285 (Bankr.D.Kan.2006). This Court is persuaded that it should include this particular badge of fraud in its analysis.

19. The Committee argues that it is entitled to recover the entire value of any nonexempt property that was disposed of through improvements to the Royal Rose Property. In support of this position, the Committee relies on *In re Keck*, 363 B.R. 193 (Bankr.D.Kan. 2007). The debtor in *Keck* took out large cash advances on credit cards in order to make improvements to his homestead, including a new driveway and patio. *Keck*, 363

B.R. at 209–11. The court in *Keck* sustained the homestead objection in the entire amount spent on the improvements. *Keck*, 363 B.R. at 211. While *Keck* supports the Committee's interpretation, the Court does not find it persuasive because the court in *Keck* did not account for the statute's use of the word "attributable."

The Committee's reading is correct in circumstances, such as in *Sissom*, where nonexempt assets were used as a down payment or to pay down principal because these uses have a direct, equivalent increase in equity. However, in the case at bar, the Debtor used nonexempt assets only on improvements to the Royal Rose Property. Improvements, unlike payments of principal, do not result in a dollar-for-dollar increase in the value of a

The Committee did not call any expert appraisers or real estate agents to testify, but instead chose to rely exclusively upon the Debtor's original Schedule A, which listed the Royal Rose Property as having a current value of $550,000.00. [Docket No. 1, p. 4.] The Debtor testified that in his opinion, the current market value of the house is $521,800.00, which is both the purchase price and the tax appraisal by the Harris County Appraisal District for the year 2007. The Debtor argues that the Court should disregard the value he assigned the property in his Schedule A and instead follow the tax appraisal because it is more current and is a market-based, objective number.

■■■■■ In the Fifth Circuit, owners of property are competent and qualified to testify about the value of their property, both real and personal. *La Combe v. A–T–O, Inc.*, 679 F.2d 431, 433 (5th Cir.1982). Additionally, the Court may consider both the sales price and the tax appraisal as evidence of present value. *In re Turnbow*, 121 B.R. 11, 13 (Bankr.S.D.Tex.1990) ("If sold fairly, the purchase price is the best evidence of the fair market value of the property.") (citations omitted); *FDIC v. Ambika, Inv.*, 42 F.3d 641, 1994 WL 708818 (5th Cir.1994) (unpublished opinion). The Debtor's own testimony, the sales price, and the most recent tax appraisal are all probative evidence that the actual current market value of the Royal Rose Property is $521,800.00.

■■■■ However, the Court is not limited to this evidence. As this Court recently discussed in *Sissom*, schedules are executed under penalty of perjury and a debtor is estopped from denying their accuracy. *Sissom*, 366 B.R. at 697 (citing *Jacobson v. Ornsby (In re Jacobson)*, 2006 WL 2796672 at 17, 2006 U.S. Dist. LEXIS 70433 at *54 (W.D.Tex. September 26, 2006); *Larson v. Groos Bank, N.A.*, 204 B.R. 500, 501 (W.D.Tex.1996)).

The purchase price of the Royal Rose Property is indicative of the market value at the time of the sale, which was $521,800.00. However, since that time the Debtor has added a pool and other improvements totaling $119,102.08. Such improvements, particularly the pool, may not have a dollar-for-dollar increase in the market value of the house, but it is improbable that such improvements did not increase the property's value to some extent. Likewise, the Court does not give much great weight to the 2007 tax appraisal, which was $3,200.00 less than the 2006 appraisal. *See The Cadle Co. v. Orsinin*, No. 06–203, 2007 WL 1006919 at *8 (E.D.Tex. Mar. 30, 2007) ("[T]ax values may or may not reflect the current fair market value of a given property; at best they are some indication of value and do not have high probative value.") (quoting *In re Deep River Warehouse, Inc.*, No. 04–52749, 2005 WL 1287987, at *9 (Bankr. M.D.N.C. Mar.14, 2005)). The Court does not believe that $119,102.08 of improvements could have reduced the value of the Royal Rose Property by $3,200.00. Also, at the time of trial, it was clearly beneficial to the Debtor to have the Royal Rose Property valued as low as possible: every dollar over the sales price is another dollar for which the Debtor is potentially liable.

property. In cases where property has increased in value over longer periods of time, the objecting party would also have to show that the increase did not occur from market appreciation. However, in the case at bar, approximately 10 weeks passed between the purchase of the homestead and the petition date. In this short window of time, the Court finds that the improvements are the only reasonable source of the increase in the value of the property.

**574**

The Court gives greater weight to the Debtor's original Schedule A than his testimony at trial, and concludes that the present market value of the Royal Rose Property is $550,000.00. Since this increase occurred in such a brief period of time, the Court concludes that this increase is "attributable" to the improvements made by the Debtor. Accordingly, the Committee's § 522(o) Objection is limited to $28,200.00, which is the difference between the current market value and the purchase price.

## V. The Committee's Objection Under 11 U.S.C. § 522(p)

### A. Introduction

The Committee objects to the Debtor's homestead exemption under § 522(p)(1) insofar as the Debtor's current homestead, the Royal Rose Property, was acquired during the 1215–day period preceding the filing of his Chapter 7 petition. Further, the Committee argues that the equity in the Royal Rose Property that the Debtor transferred from the Morning Breeze Property is not protected by the § 522(p)(2) exception because the Debtor acquired his ex-wife's community property interest in the Morning Breeze Property within the 1215–day period. The Debtor responds that: (1) the divorce decree was not an acquisition within the meaning of § 522(p); (2) the community property interest of Evelyn Presto, the Debtor's ex-wife, is not an interest within the meaning of § 522(p); and (3) sustaining the Committee's Objection would contravene the statute's intended purpose and unjustly punish the Debtor.

### B. Findings of Fact

The facts relevant to the Committee's Objection under § 522(p) are as follows:

1. On August 24, 2001, the Debtor and Evelyn Presto (the Prestos) purchased the land upon which the Morning Breeze Property would be built. [Comm. Ex. 62.] The home was custom-built during 2002 and the Prestos moved into the Morning Breeze Property sometime during January 2003.

2. The Prestos held title to the Morning Breeze Property jointly, and it was community property under the laws of the State of Texas.[20]

3. On December 8, 2003, the Prestos obtained a first mortgage on the Morning Breeze Property in the principal amount of $400,000.00. [Comm. Ex. 60.]

4. On May 13, 2005, the Debtor and Evelyn Presto entered into an Agreed Final Decree of Divorce (the Divorce Decree). [Comm. Ex. 3–A.5.]

5. Pursuant to the terms of the Divorce Decree, the Debtor received the Morning Breeze Property as his sole and separate property, and also assumed the first mortgage on the property. [Comm. Ex. 3–A.5, p. 35.] In exchange, Evelyn Presto received as her sole and separate property a home in Colorado (where she moved with the Presto children after the divorce) and a significant amount of personal property. [Comm. Ex. 3–A.5, pp. 31–35.]

6. On February 16, 2006, the Debtor refinanced the original mortgage on the Morning Breeze Property. This refinanced mortgage had a new principal amount of $650,000.00. Of this amount, $389,161.47 was used to pay off the original mortgage; $27,764.07 was used to pay a tax

**20.** *See* Tex. Fam.Code Ann. § 3.002 (Vernon 2006).

lien; $72,631.56 was used for closing costs; and the remaining $160,442.90 went to the Debtor as cash proceeds. [Comm. Ex. 63.]

7. On May 18, 2006, the Debtor sold the Morning Breeze Property for $1,390,664.21. [Comm. Ex. 64.] After paying off the $647,099.00 balance on the mortgage and $68,343.15 in closing costs, the Debtor received $675,222.06 in cash proceeds from the sale of the Morning Breeze Property. [*Id.*]

8. The sale price of the Morning Breeze Property included both the real property and the home furnishings. The closing statement does not segregate amounts for the real and personal property, but the Debtor testified that the approximate value of the personal property was $100,000.00.[21]

9. Also on May 18, 2006, the Debtor purchased the Royal Rose Property for $521,800.00. The Debtor paid the entire purchase price out of the net proceeds from the sale of the Morning Breeze Property. No liens were placed on the Royal Rose Property.

10. The Royal Rose Property is 3400 square feet in size and located in a gated development with a private country club. Upon moving into the Royal Rose Property, Presto spent $7,000 to become a member of this club. Presto is the only occupant of the Royal Rose Property except during the summer months when he has custody of his children.

11. The Debtor filed his Chapter 7 petition on July 31, 2006. [Docket No. 1.]

## C. Conclusions of Law

### 1. Introduction

11 U.S.C. § 522(p) states, in pertinent part:

(1) Except as provided in paragraph (2) of this subsection and sections 544 and 548, as a result of electing under subsection (b)(3)(A) to exempt property under State or local law, a debtor may not exempt any amount of interest that was acquired by the debtor during the 1215-day period preceding the date of the filing of the petition that exceeds in the aggregate $125,000 in value in—

. . .

(D) real or personal property that the debtor or dependent of the debtor claims as a homestead.

. . .

(2)(B) For purposes of paragraph (1), any amount of such interest does not include any interest transferred from a debtor's previous principal residence (which was acquired prior to the beginning of such 1215-day period) into the debtor's current principal residence, if the debtor's previous and current residences are located in the same State.

Section 522(p)(1) places a $125,000.00 limit on a debtor's homestead exemption as to "any amount of interest" which the debtor "acquired" in his homestead during the 1215 days preceding the date of the filing of the petition.[22] The general limita-

---

**21.** Although the Court finds that the Debtor's testimony has little credibility in many respects, it accepts the Debtor's estimate of the portion of the sales price that represented furnishings because there was no other evidence produced as to the furnishing's value.

**22.** Unlike its counterparts in §§ 522(*o*) and (q), § 522(p) does not require a finding of misconduct or fraudulent intent by the debtor. *In re Kaplan,* 331 B.R. 483, 485 (Bankr. S.D.Fla.2005); *see also In re Rasmussen,* 349 B.R. 747, 752–53 (Bankr.M.D.Fla.2006) ("It is

tion in § 522(p)(1) can only be understood in conjunction with the exception found in § 522(p)(2), which allows a debtor to roll over equity from one homestead to another if both residences are in the same state and the first homestead was acquired prior to the 1215–day period. Although numerous published opinions have discussed § 522(p), this Opinion is apparently the first to address the specific issue of whether a spouse's community property interest in a homestead is a type of "interest" that can be "acquired" by a division of property resulting from a divorce decree.[23] For the reasons stated below, the Court holds that any interest the Debtor acquired through the Divorce Decree is not protected by § 522(p)(2)(B).[24]

On July 31, 2006, the Debtor filed his Chapter 7 petition. Thus, the 1215–day period set forth in § 522(p)(1) began on April 2, 2003. Prior to the 1215–day period, the Debtor owned no interest in the Royal Rose Property. On May 18, 2006, less than three months before filing bankruptcy, the Debtor purchased the Royal Rose Property, which he now claims as his exempt homestead. The purchase of the Royal Rose Property is therefore an acqui-

sition of an interest by the Debtor in his homestead within the 1215–day period, and the Court concludes that § 522(p)(1) applies to the Debtor's homestead exemption. Since the Debtor acquired his current homestead within the 1215–day period, the general rule of § 522(p)(1) limits his homestead exemption to $125,000.00 unless he is able to show that some amount of equity in his homestead falls under the § 522(p)(2)(B) exception.

The Court's analysis of § 522(p)(2)(B) addresses two issues: first, whether Evelyn Presto's community property interest in the Morning Breeze Property qualifies as "any amount of interest;" and second, whether the transaction resulting from the Divorce Decree satisfies the requirement that such interest be "acquired by the debtor."

2. **Evelyn Presto's community property interest in the Morning Breeze Property constitutes an "interest" under § 522(p) because it had a distinct monetary value.**

■ First, the Court must determine whether Evelyn Presto's community prop-

---

clear that a debtor's intent to shield property from creditors is not a factor. In fact, in light of section 522(*o*), which deals with such intent, section 522(p) is not designed to deal with fraudulent conversions of property at all.").

**23.** Previous cases discussing § 522(p) have dealt with issues such as: (1) whether equity derived from appreciation is subject to § 522(p); *see, e.g., In re Rasmussen,* 349 B.R. 747 (Bankr.M.D.Fla.2006); *In re Blair,* 334 B.R. 374 (Bankr.N.D.Tex.2005); *In re Sainlar,* 344 B.R. 669 (Bankr.M.D.Fla.2006); (2) whether the language "as a result of electing under subsection (b)(3)(A) to exempt property under State or local law" makes § 522(p) inapplicable in so-called opt-out states where the debtor does not have the ability to choose the federal exemptions; *see, e.g., In re Wayrynen,* 332 B.R. 479 (Bankr.S.D.Fla.2005); *In*

*re Kaplan,* 331 B.R. 483 (Bankr.S.D.Fla. 2005); *In re McNabb,* 326 B.R. 785 (Bankr. D.Ariz.2005); *In re Kane,* 336 B.R. 477 (Bankr.D.Nev.2006); or (3) whether the classification of property as a homestead is within the scope of § 522(p); *see, e.g., In re Rogers,* 354 B.R. 792 (N.D.Tex.2006); *In re Greene,* 346 B.R. 835 (Bankr.D.Nev.2006).

**24.** Any interest acquired by the Debtor through the Divorce Decree can only be subject to the exception in § 522(p)(2)(B). The main rule in § 522(p)(1) only limits the value of the exemption in the Debtor's current homestead, the Royal Rose Property. Although the Debtor acquired an interest in his previous homestead, the Morning Breeze Property, through the Divorce Decree, he is not attempting to exempt any value in the Morning Breeze Property because he no longer owns that residence.

erty interest in the Morning Breeze Property is the type of interest referred to in § 522(p) as "any amount of interest." The Court's analysis relies upon existing case law on the issue of whether the homestead designation of previously owned property is sufficient to be "any amount of interest." *In re Rogers*, 354 B.R. 792 (N.D.Tex.2006); *In re Greene*, 346 B.R. 835 (Bankr.D.Nev. 2006).

In *Rogers*, the debtor inherited her current homestead over a decade before filing bankruptcy, but first moved onto that property during the 1215–day period set forth in § 522(p). *Rogers*, 354 B.R. at 794. Thus, the first time that the property qualified as the debtor's homestead under Texas law was within the 1215–day period.[25] In concluding that a mere homestead designation is not an "interest" under § 522(p), the court stated that "the plain meaning of the statute indicates that 'interest' refers to some legal or equitable interest that can be quantified by a monetary figure." *Id.* at 796. *Rogers* held that although a homestead is a legal property right in Texas, it could not be an "interest" under § 522(p) because it is impossible to assign a monetary value to such a right. *Id.* at 797 ("To read the statute as the appellant suggests would create nonsensical interpretations. For instance, how would it be possible to have a 'quantity' of prophylactic protection from liens (the legal effect of homestead designation in Texas)? Or for that matter, how would it be possible to have a 'quantity' of classifica-

tion as homestead?"). The court reached this conclusion by emphasizing the words "amount of," which precede "interest." *Id.* at 796 ("For the interest not to exceed $125,000, it inherently must be an interest capable of being reduced to a quantitative, monetary measure.").[26]

The Court adopts the *Rogers* interpretation of "interest," which requires that the interest be capable of being "quantified by a monetary figure." Here, the interest that was acquired by the Debtor from Evelyn Presto as a result of their divorce had a definite, ascertainable monetary value and, therefore, was unlike a mere homestead designation. Prior to the divorce, the Debtor shared a community property interest in the Morning Breeze Property with Evelyn Presto. As a result of the Divorce Decree, the Morning Breeze Property became the Debtor's sole and separate property. He went from owning a half interest in the undivided whole to owning the entire property in fee simple. Therefore, the monetary value of Evelyn Presto's community property interest is equal to half of the total value of the Morning Breeze Property on the date of divorce.

Counsel for the Debtor argued that the Debtor gave Evelyn Presto other valuable assets in the Divorce Decree, including a second home in Colorado, in exchange for the Morning Breeze Property, and that this exchange somehow mitigated any interest that the Debtor acquired. The

25. The debtor in *Rogers* had held title to her current homestead for over ten years, but during that time lived at a different property which she claimed as her homestead. Within the 1215–day period, the debtor moved between properties and changed her homestead designation.

26. One bankruptcy court used this same argument—that the term "amount" implied a monetary value—in assessing whether appre-

ciation is a type of "interest" within the context of § 522(p). *Rasmussen*, 349 B.R. at 756 ("This interpretation also makes sense in light of the term 'interest' being used in conjunction with 'amount.' Amount is a quantitative term. A homeowner may be thought of as having an amount of equity in a home. It would be unusual to refer to a homeowner having an amount of fee simple ownership in a home.").

Court disagrees; indeed, this exchange supports the Court's conclusion. The Divorce Decree resulted in a transaction whereby the Debtor conveyed his rights to non-exempt property in exchange for greater rights in an exempt homestead. The underlying transaction was an increase in the monetary value of the Debtor's interest in the Morning Breeze Property. Therefore, the Court finds that the community property interest acquired by the Debtor in the Divorce Decree had a monetary value, and is subject to § 522(p).

■ Not every bankruptcy court has followed the monetary value definition in *Rogers*. For example, the court in *Greene* rejected the monetary value definition of "interest." That court held that a homestead designation is an interest under § 522(p) because "the literal and plain reading of 'interest acquired' " includes a previously purchased property which only became a protected homestead within the 1215–day period. *In re Greene*, 346 B.R. at 842. The Court believes this holding is flawed because it does not give any consideration to the entire context of the phrase "any *amount* of interest that was acquired." [27] However, even if "interest" refers to a legal interest instead of a monetary interest, the Court's conclusion would not change. As a result of the Divorce Decree, Evelyn Presto executed a Special Warranty Deed with Assumption which granted the Debtor all of her rights in the Morning Breeze Property. [Comm. Ex. No. 3–A.6.] This act resulted in the legal title to the Morning Breeze Property changing after the divorce. Thus, under either interpretation of "interest"—monetary value or legal title—Evelyn Presto's community property interest qualifies as an "interest" under § 522(p).

**3. The Debtor actively participated in the negotiation of the Divorce Decree. Thus, for purposes of § 522(p), Evelyn Presto's community property interest in the Morning Breeze Property was "acquired by the debtor."**

■ The Court must next determine whether the transaction resulting from the Divorce Decree was an acquisition within the context of § 522(p). The Court believes that the phrase "acquired by the debtor" is sufficiently clear and unambiguous that it should be given its plain meaning. "The plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *U.S. v. Ron Pair Enter., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). One bankruptcy court has noted, in discussing the use of "acquired" in § 522(p), that "[t]he word acquired is not a term of art in the law of property but one in common use. The plain import of the word is 'obtained as one's own.' Black's Law Dictionary defines 'acquire' to mean: '[t]o gain possession or control of; to get or obtain.' " *Sainlar*, 344 B.R. at 672–673 (quoting *Helvering v. San Joaquin Fruit & Investment Co.*, 297 U.S. 496, 56 S.Ct. 569, 80 L.Ed. 824 (1936)).

■ In the same way that the meaning of "interest" is limited by the phrase "any amount of," courts have noted that the term "acquired" does not stand alone in § 522(p) and must be read in conjunction with the phrase "by the debtor." In considering the meaning of "acquired," bankruptcy courts have distinguished between active and passive acquisitions. "[T]he addition of the clause 'by the debtor' after

---

**27.** Likewise, *Sainlar* did not address the words "amount of" in concluding that "inter- est" in § 522(p) referred only to title to real property. *Sainlar*, 344 B.R. at 673.

'acquires' implies more than a passive acquisition—such as by appreciation; it implies an active acquisition of equity such as by an affirmative act of a down payment or mortgage pay down." *Rasmussen,* 349 B.R. at 757. The acceptance of a gift has also been held to be an active acquisition. *In re Leung,* 356 B.R. 317, 322 (Bankr. D.Mass.2006) ("To the extent that 'acquired by the debtor' requires an affirmative action, I find that the Debtor acquired an interest because he accepted delivery of the deed and then made the affirmative step to declare a homestead.").

 The Court finds that the Debtor actively acquired Evelyn Presto's community property interest in the Morning Breeze Property through the Divorce Decree. The divorce itself is not the action to be judged as either active or passive: a divorce, standing alone, does not create an acquisition. Rather, it is the Divorce Decree that this Court finds to have been an active acquisition. Both spouses were represented by counsel throughout the divorce negotiations, which resulted in an agreed division of their community property. All of the decisions made by the Debtor during this process, culminating with his signature of the Divorce Decree, cannot be characterized as a passive acquisition akin to appreciation. If the acceptance of a gift qualifies as an active acquisition, then a highly contested property division with two represented ex-spouses must be as well.[28]

Since the Divorce Decree occurred within the 1215–day period, any interest that the Debtor acquired pursuant to the Divorce Decree does not receive the safe harbor protection of § 522(p)(2)(B). However, the Debtor first acquired his community property half of the Morning Breeze Property prior to the beginning of the 1215–day period, which means that his own community property interest in the Morning Breeze Property is exempt under the § 522(p)(2)(B) exception.[29]

#### 4. The Debtor's defenses

Counsel for the Debtor argued that adopting the position set forth above—that § 522(p) applies to property divisions resulting from divorce—would both contradict the legislative intent of § 522(p) and result in a grossly inequitable policy that punishes debtors for having divorced within 1215 days prior to filing bankruptcy. The Court believes that it is not necessary to consider the legislative history of this statute because § 522(p) has a plain meaning, but, even if such a review is mandated, nothing in the Court's holding is irreconcilable with Congress' goals in enacting § 522(p). Moreover, the Court's interpretation of § 522(p) does not unjustly punish all debtors who divorce shortly before filing bankruptcy; it merely limits a debtor's homestead exemption when a prepetition

28. An alternative interpretation of the phrase "acquired by the debtor" emphasizes the role of legal title instead of the active/passive analysis. *Blair,* 334 B.R. at 376 ("However, one does not actually 'acquire' equity in a home. One acquires title to a home."); *Sainlar,* 344 B.R. at 673 ("Title to real property is acquired, equity is not."). Even under this title-based theory, the Court's conclusion would be the same. Evelyn Presto executed a Special Warranty Deed with Assumption which granted the Debtor all of her rights in the Morning Breeze Property and, in exchange, the Debtor assumed the mortgage on the home. [Comm. Ex. No. 3–A.6.] Thus, even under this title-based theory, the Divorce Decree was still an acquisition insofar as it resulted in the Debtor acquiring full fee simple title to the Morning Breeze Property.

29. The different treatment of the Debtor's community property interest and Evelyn Presto's community property interest under § 522(p)(2)(B) is discussed *infra* Sec. V.C.5.—Calculation of the Non–Exempt Portion of the Royal Rose Property Under § 522(p).

divorce has increased the value in the debtor's homestead.

a. **The Court's holding does not contradict the Congressional intent behind § 522(p) because closing the mansion loophole was not the sole purpose in enacting the statute.**

■■■ The Court believes that the language of § 522(p) in dispute—"any amount of interest acquired by the debtor"—is neither ambiguous nor vague. "If the statute is unambiguous, the court is to interpret the statute in accordance with its plain meaning and without regards [sic] to any extraneous materials." *Rogers*, 354 B.R. at 796 (citing *Leocal v. Ashcroft*, 543 U.S. 1, 9, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004)). The Court finds that the relevant language in § 522(p) is clear and can be given its plain meaning without reaching absurd results. *Ron Pair Enter.*, 489 U.S. at 242, 109 S.Ct. 1026. However, even if the Court is incorrect and the statute is ambiguous, the Court will briefly discuss the legislative history of § 522(p) in order to address any possible ambiguity. *See Blair*, 334 B.R. at 377 (concluding that § 522(p) was "reasonably clear," but that the term interest was "sufficiently ambiguous to warrant inquiry into the legislative history.").

■■■ As many courts have discussed, and this Court is keenly aware, "Congress enacted Section 522(p) largely to close so-called 'mansion loopholes' that could enable wealthy debtors to evade creditors by filing bankruptcy after converting nonexempt assets into an expensive exempted homestead in one of the handful of states that have unlimited homestead exemptions." *In re Greene*, 346 B.R. at 841 (citing *Kane*, 336 B.R. at 482); *see also Kaplan*, 331 B.R. at 488; *Blair*, 334 B.R. at 377–78. However, "[i]t

really is not for this [c]ourt to speculate on Congress' purpose when the language is clear and unambiguous. Only if the statutory language is ambiguous or would lead to absurd results should a [c]ourt attempt to discern legislative intent." *McNabb*, 326 B.R. at 789 (citing *Union Bank v. Wolas*, 502 U.S. 151, 158, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991)). "The fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning." *Union Bank*, 502 U.S. at 158, 112 S.Ct. 527. Moreover, a statute's "plain meaning is rebutted only in limited circumstances when a contrary legislative intent is clearly expressed." *Kaplan*, 331 B.R. at 487 (citing *Ardestani v. I.N.S.*, 502 U.S. 129, 135–36, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991)).

Congress' intent to close the mansion loophole does not preclude or contradict the Court's holding that applies § 522(p) to the acquisition of new value in a homestead through a divorce decree. It is an unnecessarily narrow view of the legislative history to conclude that Congress intended § 522(p) to regulate *only* those debtors who moved to another state in order to take advantage of more generous homestead exemptions. As other bankruptcy courts have noted, "the active acquisition of equity in an exempt homestead shortly before filing for bankruptcy was the focus of [§ 522(p)]." *Rasmussen*, 349 B.R. at 758. Under this less constrained view of § 522(p), the Court's interpretation actually furthers the legislative intent by stopping potential homestead exemption planning through divorce.

Thus, even if § 522(p) is deemed ambiguous and the legislative history is relevant, applying § 522(p) to a divorce decree does not contradict the statute's general intent of limiting the abuse of generous state homestead exemptions. If Congress' sole

purpose in enacting § 522(p) was to close the mansion loophole, it could have deleted the exception in § 522(p)(2)(B) and instead made the homestead limit in § 522(p)(1) only apply to debtors that moved from one state to another.

**b. The Court's holding does not unjustly punish the Debtor solely for having been divorced within 1215 days of filing his petition. Rather, the holding is directed at a specific disposition of property contained in the Divorce Decree.**

 Counsel for the Debtor also argued that, regardless of the language used in § 522(p), the Court should not interpret the statute in a way that includes acquisitions by divorce because it would be fundamentally unjust for the Code to penalize debtors for divorcing within 1215 days of filing their petition. While this argument is closely related to the argument rejected above, it is sufficiently distinct to warrant consideration.

The Debtor's characterization of this Court's holding as a punishment of all divorced debtors is off the mark. The timing of the Debtor's divorce (i.e., within the 1215–day period) is not why § 522(p) applies. Rather, the Debtor's decision to structure the Divorce Decree in a way that would maximize his interest in his exempt homestead while decreasing his interest in other non-exempt assets is the reason that § 522(p) applies. Moreover, the holding in this Memorandum Opinion will not impact every divorced debtor, only those who divorced within 1215 days before filing bankruptcy *and* acquired their ex-spouse's community property interest in their homestead through the divorce decree. This Court's holding simply discourages the use of a divorce decree as a tool for homestead exemption planning, which seems squarely in line with the in-

tent of both § 522(p) in particular and BAPCPA in general.

**5. Calculation of the Non–Exempt Portion of the Royal Rose Property Under § 522(p)**

The Court must next calculate the portion of the Royal Rose Property that is not exempt pursuant to § 522(p). This calculation is a two-step process: first, the Court must determine the total amount of interest in the Debtor's homestead that is subject to § 522(p)(1); and second, the Court must subtract from that amount any interest that qualifies as "rolled over" equity under § 522(p)(2)(B).

**a. The amount of interest in the Debtor's homestead that is subject to § 522(p)(1) is $425,000.00.**

 The Court begins by assessing the maximum potential value in the Debtor's homestead that is subject to § 522(p)(1). The calculation of § 522(p)(1) begins with the amount of interest in the homestead "acquired by the debtor" within the 1215–day period, rather than the current market value as is the case under § 522(o). As discussed above, the majority of courts have held that § 522(p) excludes appreciation because it is either not an interest or not acquired by the debtor. *Blair,* 334 B.R. at 376; *Sainlar,* 344 B.R. at 673; *Rasmussen,* 349 B.R. at 757–58. The analysis under § 522(p) should not use the homestead's current market value because it includes post-acquisition appreciation occurring within the 1215–day period.

However, in the case at bar, the difference between the purchase price ($521,800.00) and the market value of the Royal Rose Property ($550,000.00) is not attributable to passive appreciation. Instead, the current market value of the Royal Rose Property increased due to the substantial improvements made by the Debtor

immediately after purchasing the property. In its § 522(*o*) analysis, the Court described these improvements in detail, most notably a pool costing over $72,000.00. Building a custom pool was an affirmative act of the Debtor and, therefore, the corresponding increase in value from $521,800.00 to $550,000.00 must be included under § 522(p)(1). Thus, the amount of interest acquired by the Debtor in his current homestead under § 522(p)(1) is $550,000.00.

Since the Debtor has an absolute right under § 522(p)(1) to exempt the first $125,000.00 that he acquired in his homestead during the 1215–day period, the total amount of interest in the Debtor's homestead subject to § 522(p)(1) is $425,000.00.

**b. Deducting the amount of interest that qualifies as "rolled over" equity under § 522(p)(2)(B) results in a final non-exempt portion of $105,000.00.**

 The Court must subtract from $425,000.00 any amount that qualifies under § 522(p)(2)(B) as equity "rolled over" from a previous homestead.[30] The Debtor's position is that the entire $675,222.06 in proceeds that he received from the sale of the Morning Breeze Property falls under the exception in § 522(p)(2)(B) because the Morning Breeze Property was acquired prior to the 1215–day period and both residences are located in the state of Texas. Under the Debtor's theory, the entire $550,000.00 value of the Royal Rose Property would be exempt. The Court disagrees.

Although the Morning Breeze Property provided the Debtor with the funds to purchase the Royal Rose Property, the Debtor's interest in the Morning Breeze Property was acquired at two different times—a fact which makes all the difference. The Debtor acquired his community property half of the Morning Breeze Property before the 1215–day period, which means it can be rolled over under § 522(p)(2)(B); however, the Debtor acquired Evelyn Presto's community property interest within the 1215–day period, which means it is not protected under § 522(p)(2)(B). In other words, the § 522(p)(2)(B) exception protects only the half of the Morning Breeze Property that the Debtor owned before the divorce. Moreover, as explained further below, that half is only protected to the extent that it was actually used to purchase the Royal Rose Property.

**i. The value of Evelyn Presto's community property interest in the Morning Breeze Property on the date of the Divorce Decree was $450,419.26.**

To determine how much equity the Debtor could roll over pursuant to § 522(p)(2)(B), the Court must calculate the value of the Morning Breeze Property on May 13, 2005, the date of the entry of the Divorce Decree. Because the parties did not present any direct testimony or evidence as to the value of the Morning Breeze Property on this date, the Court must fashion a value from the circumstantial evidence available in the record.

The Morning Breeze Property was sold on May 18, 2006, approximately one year

---

**30.** A review of § 522(p)(2)(B) would be useful before proceeding:

"For purposes of paragraph (1), any amount of such interest does not include any interest transferred from a debtor's previous principal residence (which was ac-quired prior to the beginning of such 1215–day period) into the debtor's current principal residence, if the debtor's previous and current residences are located in the same State."

after the divorce, for $1,390,000.00. The Debtor testified that approximately $100,000.00 of that price represented home furnishings and other personal property sold together with the real property.[31] Since § 522(p) only applies to homestead exemptions, the Court must subtract the value of the furniture from the purchase price, leaving a value of $1,290,000.00 for the real property. When the Debtor refinanced his mortgage in February 2006, the principal amount left on the original mortgage was $389,161.47. Although the actual amount on May 13, 2005 (i.e., the divorce date) would differ slightly because of the nine-month time difference, the Court has no better evidence from which to estimate the amount of liens on the Morning Breeze Property on the date of the Divorce Decree. After subtracting the original mortgage, the approximate equity in the Morning Breeze Property at the time of the divorce was $900,838.53 (i.e., $1,290,000.00–$389,161.47). This amount was comprised of two parts: one half was Evelyn Presto's community property interest, acquired by the Debtor in the Divorce Decree on May 13, 2006; and the other half was the Debtor's community property share, acquired prior to the 1215–day period. In other words, under § 522(p)(2)(B), the Debtor could *potentially* roll over $450,419.26 of equity from the Morning Breeze Property into the Royal Rose Property, but the other $450,419.26 was not protected by § 522(p)(2)(B) because it was acquired within the 1215–day period.[32]

## ii. Reduction of equity due to the February 16, 2006 refinancing

The $450,419.26 that the Debtor acquired before the 1215–day period is protected by § 522(p)(2)(B) only to the extent that it was actually used to purchase the Royal Rose Property on May 18, 2006. On February 16, 2006, after the divorce but before the sale of the Morning Breeze Property, the Debtor refinanced the original mortgage on the Morning Breeze Property. The result of this transaction increased the total amount of liens on the property by $260,838.53.[33] The Court must account for this intervening reduction in equity in determining how much of the $450,419.26 remained when the Debtor purchased the Royal Rose Property on May 18, 2006. This is not a straightforward task because, at the time of refinancing, the Morning Breeze Property was the Debtor's sole and separate property and did not have two separate halves, as under this Court's § 522(p)(2)(B) analysis. There are two plausible ways to apply the $260,838.53. It can either be charged entirely against the non-exempt half (i.e., Evelyn Presto's half that was acquired in the Divorce Decree) or it can be applied ratably against both the non-exempt half and the exempt half.[34] For the reasons

---

**31.** *See* footnote 21.

**32.** The Court's calculation is:

| | |
|---|---|
| $1,390,000.00 | (sales price on May 18, 2006) |
| – $ 100,000.00 | (portion of sales price representing furniture) |
| – $ 389.161.47 | (estimated existing liens on May 13, 2005) |
| $ 900,838.53 | (equity on May 13, 2005) |
| ÷ 2 | |
| $ 450,419.26 | (value of each community property interest on May 13, 2005) |

**33.** This transaction was accompanied by several strange circumstances which still con-

cern the Court. First, $72,631.56 of the $260,838.53 was applied to closing costs, which means that closing costs were 36.8% of the new money lent to the Debtor ($72,631.56/$188,206.97) and 12.6% of the total refinanced amount ($72,631.56/$577,368.44). These closing costs strike the Court as unseemly. Additionally, the $160,442.90 received by the Debtor came in the form of ten small checks rather than one single check.

**34.** There is an obvious third option, charging the entire amount against the Debtor's ex-

described below, the Court rejects the former approach and adopts the latter.

### a. The Doctrine of Marshaling Assets Under Texas Law

 Under Texas law, the equitable doctrine of marshaling would support deducting the entire refinanced amount from the non-exempt portion of the Morning Breeze Property. The rule of marshaling is most often invoked by a junior lienholder. The typical fact pattern involves two creditors and two encumbered parcels of land: one parcel on which both creditors have liens and a second parcel that is encumbered only by a lien held by the senior lienholder on the first property. The junior lienholder on the first property may force the senior lienholder to foreclose on the property that is encumbered by only one lien before turning to the doubly secured property. *Kerens Nat'l Bank v. Stockton,* 120 Tex. 546, 553, 40 S.W.2d 7 (1931); *Killingsworth v. Rembert Nat'l Bank,* 32 S.W.2d 645, 647 (1930).

 The doctrine of marshaling may also be invoked by a debtor in defense of his homestead. There is a "well-established rule in this state, that all nonexempt property of the debtor, both real and personal, must be exhausted before the homestead can be sold; and that a debtor may lawfully insist that recourse shall last be had to the homestead property, and that the lienholder whose security affects the homestead with other land shall resort, first, to the other lands, even though by so doing the security of other creditors on the same land may be impaired or destroyed." *Burg v. Hitzfeld,* 89 S.W.2d 272, 276 (Tex. Civ.App.-San Antonio 1935, writ dism'd) *see also Kerens,* 120 Tex. at 554, 40 S.W.2d 7 (citing *Pridgen v. Warn,* 79 Tex. 588, 15 S.W. 559 (1891)).

Neither party raised the doctrine of marshaling. However, the Court believes that its analysis would be incomplete without taking this policy into consideration. In the case at bar, the doctrine of marshaling would require this Court to deduct the $260,838.53 from the refinanced loan entirely against the $450,419.26 portion that he acquired from Evelyn Presto because, under § 522(p), that portion is non-exempt and the portion he acquired prior to the 1215–day period is exempt.[35]

### i. Under Texas law, the doctrine of marshaling would not necessarily apply to the case at bar.

The Court does not believe that the factual circumstances of this case justify an application of the doctrine of marshaling because marshaling requires the existence of a non-exempt asset; at the time of the sale of the Morning Breeze Property on May 18, 2006, no such non-exempt property existed.[36] Both at the time the Debtor refinanced the mortgage and at the time of the sale, the Morning Breeze Property was entirely exempt under state law since it was a single homestead solely and separately owned by the Debtor. The lien placed on the property could not have made reference to any divided portion of the Morning Breeze Property because

---

empt portion. However, the Court can find no legal justification for such a deduction.

**35.** If marshaling were applied in this manner, it would result in no amount being non-exempt under § 522(p) because the amount that would be rolled over under § 522(p)(2)—i.e., $450,419.26—would exceed the amount subject to § 522(p)(1), i.e., $425,000.00.

**36.** Marshaling is also applicable in the case of a bifurcated asset that has both exempt and non-exempt portions, such as a tract of land that exceeds the allowed acreage of a homestead in Texas.

such a division would not need to be imposed under state law. Any non-exempt portion came into existence only upon the Debtor's filing for bankruptcy protection under federal law as a result of the operation of § 522(p).[37] The state policy of first using all non-exempt assets is inapplicable because no non-exempt real property existed under Texas law at the time of refinancing. Moreover, the correct time to apply marshaling would be when the Debtor sold the Morning Breeze Property and satisfied the lien, rather than on the date of the petition. Therefore, the doctrine of marshaling does not apply to the case at bar because under Texas law, there was no non-exempt portion to deduct the lien against. Because marshaling does not apply, the Court finds that the most equitable division would be to reduce the pre- and post-divorce halves by the same amount.

### ii. Congress intended to supersede the policy of Texas' homestead law by enacting 11 U.S.C. § 522(p).

■■■ The Debtor's election of state law exemptions does not necessarily mean that state law would determine how to apply the funds. The Supreme Court has stated, "Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) (quoting *Lewis v. Mfrs. Nat'l Bank*, 364 U.S. 603, 609, 81 S.Ct. 347, 5 L.Ed.2d

323 (1961)). The Fifth Circuit "has interpreted *Butner* to extend deference to state law whenever Congress has the authority to regulate an area under its bankruptcy powers but has chosen not to do so." *Anderson v. Conine (In re Robertson)*, 203 F.3d 855, 859 (5th Cir.2000) (citing *In re Hudson Shipbuilders, Inc.*, 794 F.2d 1051 (5th Cir.1986)). By enacting § 522(p), Congress has exercised its authority to regulate homestead exemptions in a way that directly conflicts with Texas law.

As discussed earlier, the clear intent of Congress in passing § 522(p) was to close the so called "mansion loophole." *Kane*, 336 B.R. at 482; *Kaplan*, 331 B.R. at 488; *Blair*, 334 B.R. at 377–78. Although BAPCPA maintained the two-track system of exemptions, which allows states such as Texas to permit debtors to select either state or federal exemptions, the addition of §§ 522(*o*), (p), and (q) demonstrates Congress' intent to prevent states from having unlimited and unregulated homestead exemptions.[38] This is particularly true of § 522(p), which imposes a strict limit on the exempt interest in homesteads acquired within 1215 days of filing regardless of the homestead laws of the debtor's state. In *Sissom*, this Court described the addition of § 522(*o*) as a "sea change with respect to protection of homesteads." *Sissom*, 366 B.R. at 714. The same could be said of § 522(p).

The doctrine of marshaling is an equitable doctrine which fosters the underlying policy behind Texas homestead laws—preventing forced sales of the homestead. It follows that if § 522(p) was designed by Congress to supersede Texas homestead law (by placing federal limits on state

---

**37.** Indeed, if the Debtor had never filed bankruptcy, there would be nothing under state law that could limit his homestead exemption in a similar fashion as § 522(p).

**38.** *See Kane*, 336 B.R. at 482–85 (noting the comments of numerous members of Congress expressing their desire to limit homesteads specifically in Florida and Texas); *see also McNabb*, 326 B.R. at 789, n. 9.

homestead exemptions allowed in bankruptcy) then any policies—such as marshaling—which fall under the rubric of state law homestead protections should also be superseded. When applying a federal statute that undermines a state law policy, it makes little sense to invoke an equitable doctrine to reinforce that same state law policy.

### b. Reducing both the exempt and non-exempt portion equally results in a final non-exempt portion of $105,000.00 under § 522(p).

The Court believes that the correct approach is to apply the $260,838.53 (i.e., the total amount that the Debtor's home equity loan decreased the equity in the Morning Breeze Property) equally against both the non-exempt and exempt portions. The Debtor's exempt portion of $450,419.26 should be reduced by $130,419.26 (i.e., half of the $260,838.53), which leaves $320,000.00. This figure represents the total amount of equity that the Debtor rolled over from the Morning Breeze Property into the Royal Rose Property under § 522(p)(2)(B); and, therefore, this amount of equity retains its exempt status.

Returning to the larger equation, this $320,000.00 that was rolled over under the § 522(p)(2)(B) exception must be subtracted from $425,000.00, which is the total amount subject to the general principle in § 522(p)(1).[39] The final result of the computation under §§ 522(p)(1) and (p)(2)(B) is that $105,000.00 of the Royal Rose Property is non-exempt. It may be helpful to have this final calculation expressed in the form of a mathematical equation:

| | |
|---|---|
| $550,000.00 | (interest acquired in Royal Rose Property during 1215-day period) |
| − $125,000.00 | (statutory limit provided by § 522(p)(1)) |
| − $320.000.00 | (equity rolled over from Morning Breeze Property under § 522(p)(2)(B)) |
| $105,000.00 | (total non-exempt portion under § 522(p)) |

## VI. The Committee's Objection Under 11 U.S.C. § 522(q)

### A. Introduction

The Committee's Objection under § 522(q)(1)(B)(ii) is based on the Debtor's receipt of a post-divorce tax refund check.[40] Under the terms of the Divorce

---

**39.** The Court does not believe that there is any reason to give the Debtor a credit for the closing costs that would be incurred in the sale of his homestead. It appears that only one court has ever done so. *In re Summers,* 344 B.R. 108, 113 (Bankr.D.Ariz.2006) (subtracting 6% selling costs from the total value of the house in the same manner as the court subtracted liens). No reason was stated for crediting the debtor with these costs, and the Court finds no justification to do so in the instant case—especially in light of the suspiciously high costs incurred during the sale of the Morning Breeze Property. *See* fn. 33.

**40.** The Committee's Objection contained an additional theory under § 522(q). The Committee argued that the Judgment [Comm. Exs. 3–C.1 and 3–C.3] was res judicata as to the issue of fraud and the existence of a fiduciary capacity. The Court granted the Debtor's oral motion for judgment on partial findings

pursuant to Fed.R.Civ.P. 52(c) as to this theory. First, the Judgment made findings only as to hinder or delay under § 548, but made no findings of fraud. [Comm. Ex. 3–C.1, pp. 86–93.] Section 522(q) requires actual fraud, and not merely an intent to hinder or delay. Second, the court in the avoidance action concluded that the debt owed by the Debtor to the Committee arose from the misconduct of Enron's board of directors in writing the bonus checks; the Debtor was merely liable as the recipient of a fraudulent transfer. There was no finding in the Judgment that the Debtor had been a fraudulent actor himself. In ruling against the Committee on the motion for partial judgment, the Court concluded that, as a matter of law, the language "the debtor owes a debt arising from" required that the debtor be the fraudulent actor and not merely a third party beneficiary/recipient of the actions of another entity. It is not

Decree, Evelyn Presto was entitled to half of these proceeds because the refund was for a year during which the parties were married. The Committee asserts that the receipt of these funds created a fiduciary obligation towards Evelyn Presto pursuant to the language of the Divorce Decree, and, further, that the Debtor breached this fiduciary duty by intentionally concealing the existence of the tax refund from Evelyn Presto.

The Debtor responds that: (1) he did not act with fraudulent intent because he timely wrote a check to Evelyn Presto for her half of the tax refund, and that the check was lost in the mail; (2) § 522(q) does not apply because the tax refund debt was fully satisfied post-petition; and (3) his homestead is not subject to § 522(q)(1) because it is "reasonably necessary" for his support under § 522(q)(2) due to the fact that he needs a pool to relieve his arthritic condition. For the reasons stated below, the Court rejects each of these defenses and finds that the Debtor is limited to a $125,000.00 exemption by § 522(q)(1)(B)(ii).

## B. Findings of Fact

1. On May 13, 2005, the Debtor and Evelyn Presto entered into the Divorce Decree. [Comm. Ex. 3–B.3.] The Divorce Decree states:

 [I]f a refund is made for the overpayment of taxes for any year during the parties' marriage in which a joint federal income tax return was filed that each party shall be entitled to one-half of the refund and the party receiving the refund check is designated as a constructive trustee for the benefit of the other party to the extent of one-half of the total amount of the refund, and shall pay to the other party one-half of the total refund check within five days of receipt of the endorsed refund check. It is further ORDERED that the parties will cooperate executing any refund check.

 [*Id.*]

2. In the Fall of 2005, the Debtor prepared an amended joint tax return for 2002, a year during which the parties were married. The Prestos' amended tax return resulted in a refund for 2002.

3. The Debtor signed Evelyn Presto's name to the amended tax return without her knowledge or consent. She had no knowledge that a refund would be forthcoming. [Comm. Ex. 3–B.7 (Transcript of Evelyn Presto deposition), p. 39.]

4. On October 21, 2005, the U.S. Treasury issued a tax refund check in the amount of $24,568.00 made payable to "Kevin M. & Evelyn L. Presto." [Comm. Ex. 3–B.5.]

5. Upon receipt of the tax refund check, the Debtor endorsed the check with his own name and, again without her knowledge or consent, signed the name of Evelyn Presto. [Comm. Ex. 3–B.5.] On October 25, 2005, the Debtor deposited the tax refund check into his Wells Fargo account. [Comm. Ex. 10, WF–0042.]

6. On July 31, 2006, the date that the Debtor filed his Chapter 7 petition, Evelyn Presto had not received any payment from the Debtor for her half of the tax refund. The Debtor did not schedule Evelyn Presto as a creditor, and she did not file a proof of claim for this debt because she

enough to establish that the debt arose from *a* fraud; it must have been from the *Debtor's* fraud.

had no knowledge of the tax refund. [Comm. Ex. 3–B.7 (Transcript of Evelyn Presto deposition), p. 99–100.]

7. On November 30, 2006, the Debtor sent an email to Evelyn Presto informing her for the first time of the existence of the amended tax return and refund check. This email states, in pertinent part:

I have been subject to numerous discovery requests that involve digging up years worth of old bank statements, sources and uses of cash, tax returns, etc. As I was going through the various documents, including old tax returns, I came across a situation whereby it appears you never received the $12,284 [check] for 50% of the restated 2002 tax return refund resulting from a 2004 loss carryback. This return was restated in the fall of 2005 (post divorce), and I acted as your constructive trustee (as the decree calls for on page 43), endorsed the return on your behalf and endorsed the refund check on your behalf. However, the Wells Fargo statements suggest that you never received the 50% of the refund that you were entitled too [sic] per the decree. If you recall, I had just paid you $30,000 in November 2005 pursuant to the decree and this was about the same time I received the IRS refund check. I don't recall what happened, but I thought I had sent you both checks at the same time ($30,000 and $12,284), but the Wells Fargo bank statements only showed the $30,000 check clearing in November 2005 ... I'm pretty certain I mailed the check, but nothing ever hit my account.

[Presto Ex. G.]

The Debtor then offered to satisfy the debt by making a $2,000.00 payment on December 1, 2006 and a $1,000.00 payment for each of the next 12 months. [*Id.*]

8. Evelyn Presto expressly rejected the Debtor's offer to pay in installments and demanded immediate payment of the entire $12,284.00. The Debtor failed to do so, but began mailing the monthly payments as set forth in his email of November 30, 2006. [Comm. Ex. 3–B.7 (Evelyn Presto Deposition), Ex. 6.] Evelyn Presto accepted a $2,000.00 check in December 2006 and a $1,000.00 check in January 2007.

9. On December 7, 2006, the Debtor executed an amended Schedule F which did not include the tax refund debt owed to Evelyn Presto. [Docket No. 159.]

10. On January 30, 2007, Evelyn Presto sent an email to the Debtor which inquired, "Will you be mailing the remainder of tax refund as discussed? I did not/have not agreed to monthly payments, and would like what's owed to me in full." [Comm. Ex. 3–B.7 (Evelyn Presto Deposition), Ex. 9.]

11. On February 10, 2007, the Debtor sent Evelyn Presto a letter regarding satisfaction of the tax refund debt. The Debtor testified that his counsel for this matter, Michael Colvard, actually drafted this letter. This letter reads, in pertinent part, as follows:

I have tendered the first and second installments, bringing a [sic] total payments that you have received to $3,000. Pursuant to follow-up emails and verbal discussions, I understand that you prefer to be paid off the final balance in a lump sum, which I have agreed to do. Therefore, the following agreement has been reached:

1. I agree to pay the total sum of $10,000 in consideration for any remaining balance owed to you for the IRS refund. A check for that amount is enclosed herein. By endorsement of this check, you agree to the following terms:

a. The receipt and payment of said sum constitutes full and final satisfaction of any and all claims you have to any remaining sums due for the income tax refund;

. . .

c. You will assert no future claims in law or in equity, whether criminal or civil, in relation to the receipt and endorsement of the refund check;

d. That payment of the enclosed $10,000 check, together with two prior installments of $2,000 and $1,000, respectively for a total of $13,000, compensates you in full for all claims of principle [sic], interest or other in relation to your rights to one-half of the tax refund;

[Presto Ex. H.]

12. On February 16, 2007, the Committee filed a Supplemental Objection to Debtor's Claim of the Homestead Exemption. [Docket No. 107.] This Supplemental Objection raised the issue of the Debtor's conduct regarding the tax refund proceeds for the first time.

13. On February 20, 2007, Evelyn Presto endorsed the $10,000.00 check contained in the February 10, 2007 letter. With her receipt of the $10,000.00, the tax refund debt was fully satisfied. [Comm. Ex. 3–B.7 (Transcript of Evelyn Presto Deposition), p. 101.]

14. On March 8, 2007, the Debtor executed an affidavit, attached to his Motion for Summary Judgment, stating, "Upon receipt of the tax refund check in October 2005, I made a check payable to my former wife, Evelyn Presto, for exactly one-half of the entire amount of the refund check. I recall preparing that check because I prepared another check in the amount of $30,000 payable to Evelyn Presto *on that same date*" [Docket No. 128, Ex. 6, ¶ 14 (emphasis added).]

15. On March 30, 2007, the Debtor executed an amended version of the same affidavit, which was attached to his Objection to one of the Committee's Motions for Summary Judgment. This second affidavit states, "I recall preparing that check because I prepared other checks payable to Evelyn Presto *on or about that same date* in the amounts of $30,000 and two checks for $600 each." [Docket No. 145, Ex. 6, ¶ 14 (emphasis added).]

16. Check number 2093 in the amount of $30,000.00 is dated October 25, 2005. The two $600 checks, numbers 2097 and 2098, are dated October 28, 2005. [Comm. Ex. 17; Comm. Ex. 10, WF–000167–169.] The next check, number 2100, is dated November 10, 2005. [Comm. Ex. No. 10, WF–0050.]

17. The monthly statement of the Debtor's Wells Fargo account shows the following checks being honored:

| Check Number | Date Cashed | Amount |
| --- | --- | --- |
| 2093 | 10/31 | $30,000.00 |
| 2094 | 11/02 | $ 200.00 |
| 2095 | 11/16 | $ 1,000.00 |
| 2096 | 10/31 | $ 2,600.00 |
| 2097 | 11/01 | $ 600.00 |
| 2098 | 11/01 | $ 600.00 |
| 2100 | 11/14 | $ 1,100.00 |

[Comm. Ex. No. 10, WF–0050.]

18. The Debtor testified that he wrote check number 2099 to Evelyn Presto within one or two days of the other three checks that benefitted her, but that it must have been lost in the mail.

19. The Debtor testified that all four checks to Evelyn Presto (numbers 2093, 2097, 2098 and 2099) were written and mailed from his place of work in the Marathon Tower in Houston, Texas.

20. The Debtor testified that he did not mail all four checks together in one envelope. The two $600.00 checks were child support payments that went to a state disbursement agency, not directly to Evelyn Presto. At the June 20, 2007 hearing, when asked by his own counsel on direct examination why the $30,000.00 check and the check for the tax refund were not mailed in the same envelope to Evelyn Presto, the Debtor testified, "I had [the tax refund check to Evelyn Presto] sitting in a separate envelope on my desk counter at my former employer and I just … I guess I was maybe worried about the funds in there or something … I don't know … but it didn't get mailed on the same date." He further testified that he specifically remembered writing all four checks close together in time because he "was not happy that [he] was writing checks for that amount of money to [his] ex-wife."

21. The Debtor testified that he did not discover that check number 2099 was missing until November 2006 while preparing bank statements as part of document production in this case. The Debtor further testified that this year-long oversight was due to "sloppy" balancing of his checkbook and the stress of the avoidance action litigation.

22. The daily balance of the Wells Fargo account during the time when check number 2099 could have been written was as follows:

| Date | Balance |
| --- | --- |
| 10/31 | $11,494.95 |
| 11/01 | $ 9,365.09 |
| 11/02 | $ 8,890.79 |
| 11/03 | $ 5,608.22 |
| 11/04 | $ 5,550.74 |
| 11/07 | $ 5,467.66 |
| 11/08 | $ 5,044.09 |
| 11/09 | $ 4,880.09 |

[Comm. Ex. 10, WF–0054.]

23. At the end of November 2005, the balance of the Wells Fargo account was $3,063.06 [Comm. Ex. 10, WF–0049], and at the end of December 2005 the balance was $3,865.11. [Comm. Ex. 10, WF–0055.]

24. The Debtor testified that he suffers from a severe arthritic condition, and that he uses his pool and spa for approximately one hour each morning in order to alleviate the pain of his arthritis. The Debtor presented no expert testimony regarding his medical condition.

25. In order to construct the pool, the Debtor needed the approval of the homeowners' association in the Royal Oaks development. The association had a standard 45–day waiting period before approving any proposals. In an attempt to expedite the approval process, the Debtor sent an email to members of the association explaining his need to have construction on the pool begin sooner than the standard 45 days. The email reads, in pertinent part:

"I would still like to explain in writing my personal situation. Again, I am not asking for special treatment, just a little 'push' if possible as a favor to me for the reasons outlined below.

I went through a nasty divorce last summer which involved a custody battle as well. I currently have my children the entire 80 day summer and basically all holidays. My children arrive on June 2, 2006 and leave on August 12, 2006. I have sold my current house which had a swimming pool that my children loved dearly and swam in literally every day of every summer. My children are ages 8 and 5 and have been swimming since they were 1 year old. This is the first summer I will have the children by myself, and the first time they have seen me in a different house. I want my children to be happy with their situation and be excited about having a slide, hot tub, nice pool, etc. to use in their backyard for as much of the summer as possible. *If I didn't have my beautiful young children to please, I would not be asking for accelerated approval,* but please understand (like all good Daddy's [sic]), I want to put a big smile on my children all summer and Mike has designed a beautiful backyard haven that I want them to enjoy all summer."

[Debtor Ex. R; Docket No. 165, Ex. C (emphasis added).]

This email makes absolutely no mention of the Debtor's arthritic condition, which he testified was so severe that without the aid of a pool that he was occasionally unable to leave the house.

26. The Debtor is currently employed by Bear Energy, an affiliate of Bear Stearns Companies Inc. His annual salary is $175,000.00, with a guaranteed $100,000.00 bonus in the first year and potential bonuses in future years.

## C. Conclusions of Law

**1. Section 522(q)(1)(B)(ii) requires the Committee to prove that (a) the Debtor owed Evelyn Presto a fiduciary duty; and (b) he committed fraud, deceit, or manipulation while acting in this fiduciary capacity.**

Section 522(q)(1)(B)(ii) provides, in pertinent part:

(1) As a result of electing under subsection (b)(3)(A) to exempt property under State or local law, a debtor may not exempt any amount of an interest in property described in subparagraphs (A), (B), (C), and (D) of subsection (p)(1) which exceeds in the aggregate $ 125,000 if—

. . .

(B) the debtor owes a debt arising from—

. . .

(ii) fraud, deceit, or manipulation in a fiduciary capacity or in connection with the purchase or sale of any security registered under section 12 or 15(d) of the Securities Exchange Act of 1934 or under section 6 of the Securities Act of 1933;

The Committee interprets § 522(q)(1)(B)(ii), based on the placement of commas, or the lack thereof, to mean that the phrase "in a fiduciary capacity or in connection with the purchase or sale of any security registered under section 12 or 15(d) of the Securities and Exchange Act of 1934 or under section 6 of the Securities Act of 1933" modifies only "manipulation" and does not apply to "fraud" or "deceit." In other words, the Committee contends that a debt arising out of *any* kind of fraud

or deceit is sufficient for § 522(q)(1)(B)(ii). The Court disagrees.

Similar language appears in §§ 523(a)(19)(A)(i) and (ii), which except from discharge any debt that is for:

(i) the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or

(ii) common law fraud, deceit, or manipulation in connection with the purchase or sale of any security

This section added a new type of nondischargeable debt as part of the Sarbanes–Oxley Act of 2002, Pub.L. No. 107–204, § 803(3), 116 Stat. 745. *Sherman v. SEC (In re Sherman)*, 491 F.3d 948, 974, 2007 U.S.App. LEXIS 15833, at *70 (9th Cir. July 3, 2007); *Smith v. Gibbons (In re Gibbons)*, 289 B.R. 588, 589 (Bankr. S.D.N.Y.2003). The addition of § 523(a)(19) was designed to close a "loophole" which allowed debtors convicted of securities fraud or other securities violations to discharge the debt owed to their victims. *Gibbons*, 289 B.R. at 592 (citing comments of Senator Patrick Leahy, 148 Cong Rec. S 1787 (daily ed. March 12, 2002) and the Committee Report, S. Rrp. No. 107–146 (2002)). The purpose of adding

§ 523(a)(19) was not to prevent the discharge of a debt arising from any common law fraud, but only those debts arising from securities related fraud.

 Sections 522(q)(1)(B)(ii) and 523(a)(19) contain similar language, the difference being that Congress inserted the phrase "in a fiduciary capacity" between "fraud, deceit or manipulation" and "the purchase or sale of any security." 11 U.S.C. § 522(q)(1)(B)(ii). Congress has consistently linked the phrase "fraud, deceit or manipulation" to securities violations.[41] Nothing about the addition of "in a fiduciary capacity" warrants a severance of this connection.[42] Thus, instead of accepting the Committee's interpretations of § 522(q)(1)(B)(ii), the Court interprets this provision to require that the "fraud, deceit, or manipulation" must have occurred while the Debtor was acting *either* in a fiduciary capacity *or* in connection with the purchase or sale of any registered security. Since there are no facts relating to the purchase or sale of any securities, the Committee bears the burden of proof on two elements in order to sustain its objection to the Debtor's homestead exemption under § 522(q)(1)(B)(ii): first, the Committee must establish that the Debtor owed Evelyn Presto a fiduciary obligation in relation to the tax refund proceeds; and second, the Committee must show that the Debtor

---

**41.** The language "fraud, deceit, or manipulation" has been used by Congress in other instances, each within the context of securities regulation. For example, the Securities Enforcement Remedies and Penny Stock Reform Act of 1990, Pub.L. No. 102–409 § 101, 104 Stat. 931, 932–33 (codified at 15 U.S.C. § 77t(d)), has a multi-tiered penalty system that includes the phrase "fraud, deceit, manipulation, or a deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 77t(d)(2)(B); *see also SEC v. Kern*, 425 F.3d 143, 153 (2nd Cir.2005). Section 804 of the Sarbanes–Oxley Act extended the statute of limitations to bring claims for "fraud, deceit,

manipulation or contrivance in contravention of a regulatory requirement concerning the securities laws." *Newby v. Enron (In re Enron Corp Secs.)*, 465 F.Supp.2d 687, 711 (S.D.Tex.2006).

**42.** Although corporate directors and officers have fiduciary obligations, the language of § 522(q)(1)(B)(ii) does not limit its application to corporate settings. The statute simply uses the term "in a fiduciary capacity" which encompasses a wide range of fiduciary relationships.

committed fraud, deceit, or manipulation while acting in that fiduciary capacity.

### 2. The Debtor's receipt of the tax refund proceeds created a fiduciary obligation to Evelyn Presto.

 The Committee argues that although the marital fiduciary relationship terminated after the divorce, the language of the Divorce Decree created a new fiduciary duty that first came into existence when the Debtor received the tax refund check.[43] The Divorce Decree states that "the party receiving the [tax] refund check is designated as a constructive trustee for the benefit of the other party to the extent of one-half of the total amount of the refund." [Comm. Ex. No. 3–B.3.] The Committee characterizes this language as creating an ordinary trustee-beneficiary relationship, citing case law generally holding that a trustee owes a fiduciary duty to the trust beneficiaries. A constructive trust, however, is unlike other trusts. "Under Texas law, a constructive trust is not actually a trust, but rather an equitable remedy imposed by law to prevent unjust enrichment resulting from an unconscionable act.... The two circumstances that generally justify the imposition of a constructive trust are actual fraud and the *breach of a confidential or fiduciary relationship.*" *Haber Oil Co. v. Swinehart (In re Haber Oil Co.),* 12 F.3d 426, 436 (5th Cir.1994) (emphasis added) (citations omitted). The breach of a pre-existing fiduciary relationship gives rise to a constructive trust; whereas, in a traditional trust, the pre-existing trust gives rise to the existence of a fiduciary duty. Thus, the Court concludes that the language in the Divorce Decree designating the Debtor as a constructive trustee is insufficient to establish a fiduciary relationship.

 However, in the instant case, Texas law imposes a fiduciary relationship notwithstanding any language in the Divorce Decree. In a divorce, the court may award one spouse title to future property that will come into the sole possession of the other spouse. The Texas Family Code further provides, "The subsequent actual receipt by the non-owning party of property awarded to the owner in a decree of divorce or annulment creates *a fiduciary obligation* in favor of the owner and imposes a constructive trust on the property for the benefit of the owner." TEX. FAM. CODE ANN. § 9.011(b) (Vernon 2006) (emphasis added). "[This section][44] specifically provides that subsequent, later receipt by a party of property that has been awarded to the rightful owner creates a fiduciary obligation in favor of the owner." *Jeffcoat v. Jeffcoat,* 886 S.W.2d 567, 570 (Tex.App.-Beaumont 1994, no writ); *see also Echols v. Echols,* 900 S.W.2d 160, 162 (Tex.App.-Beaumont 1995, writ denied). The Court sees no reason that the statute would not apply in this situation. The tax refund was future property that the par-

---

43. The fiduciary relationship between husband and wife terminates upon divorce. *In re Marriage of Notash,* 118 S.W.3d 868, 872 (Tex.App.-Texarkana 2003, no writ) (citing *Grossnickle v. Grossnickle,* 935 S.W.2d 830, 846 (Tex.App.-Texarkana 1996, writ denied)); *see also Bass v. Bass,* 790 S.W.2d 113, 119 (Tex.App.-Fort Worth 1990, no writ) ("Although marriage may bring about a fiduciary relationship, such a relationship clearly does not continue when a husband and wife hire numerous independent professional counsel to represent them respectively in a contested divorce proceeding." (citation omitted)). Therefore, after their divorce on May 13, 2005, the Debtor did not owe a fiduciary duty to Evelyn Presto.

44. Prior to renumbering in 1997, Tex. Fam. Code § 9.011 appeared at Tex. Fam.Code § 3.75.

ties divided in the Divorce Decree and, therefore, the statute applies.

Since half of any potential tax refund was awarded to Evelyn Presto, the Court finds that Tex. Fam.Code § 9.011(b) created both a fiduciary obligation *and* a constructive trust between the Debtor and Evelyn Presto upon the Debtor's receipt of the tax refund proceeds on October 25, 2005. Therefore, the Committee has met its burden of showing the existence of a fiduciary relationship.

### 3. The Debtor committed fraud, deceit, or manipulation while acting a fiduciary capacity.

Second, the Committee must show that the Debtor committed either fraud, deceit, or manipulation while acting in this fiduciary capacity. These three terms have distinct meanings in the context of securities law, but those definitions do not apply here because there is no allegation of a connection to the purchase or sale of any security.[45] Instead, the Court defines each of the three terms in § 522(q)(1)(B)(ii) as they are used to modify the phrase "fiduciary capacity" independent of their securities law meaning.[46]

### a. Fraud and deceit in a fiduciary capacity

Fraud requires proof of six elements: (1) a material representation, (2) that was false, (3) that the speaker knew was false or was made recklessly without knowledge of its truth or falsity, (4) with the intent to have the other party rely, (5) actual reliance by the other party, and (6) damages. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex.1992) (citing *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex.1977)); *see also Southwestern Packing Co. v. Cincinnati Butchers' Supply Co.*, 139 F.2d 201, 203 (5th Cir.1943). Fraud and deceit are essentially synonymous. *See* RESTATEMENT (SECOND) OF TORTS § 525 (deceit and fraudulent misrepresentation listed as the same cause of action); *Meyers v. Moody*, 693 F.2d 1196, 1214 (5th Cir.1982) (the elements of common law fraud or deceit are identical under Texas law); *see also Southwestern Packing Corp., Inc. v. Cincinnati Butchers' Supply Co.*, 139 F.2d 201, 203 (5th Cir.1943). Thus, despite § 522(q)(*l*)(B)(ii) listing fraud and deceit separately, the Court interprets both words to require proof of the same elements. Additionally, the fraudulent actions must have occurred while the Debtor owed a fiduciary duty to Evelyn Presto. As stated above, the Debtor's fiduciary duty only arose upon his actual receipt of the tax refund proceeds. Thus, while the Court believes that the Debtor's two acts of forgery—on the tax return and the refund check—were deplorable and patently fraudulent, the applicable time frame for

---

**45.** For example, the term manipulation has a longstanding definition in the context of § 10(b) of the Securities and Exchange Act of 1934. The Supreme Court has described manipulation as "virtually a term of art when used in connection with securities markets" and listed examples "such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). In the case at bar, the term manipulation is not being used in connection with securities and it would be impossible to adopt this market-based definition in the broader context of all fiduciary duties.

**46.** If the Court instead faced a § 522(q) objection based on a securities transaction, it would apply the definitions developed by the Supreme Court for dealing with § 10(b) violations.

this analysis is after the Debtor cashed the refund check on October 25, 2005.

█ This is a case of intentional concealment where there was a duty to disclose. *Chiarella v. U.S.*, 445 U.S. 222, 230, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). The Divorce Decree required that the Debtor cooperate in the execution of any refund check and that the Debtor remit to Evelyn Presto one-half of any refund amount within five days of its receipt. [Comm. Ex. 3–B.3.]

The Debtor's argument is that he lacked fraudulent intent because he immediately wrote and mailed a check to Evelyn Presto for her half of the tax refund and, through no fault of his own, the check was "lost in the mail." The Court was immediately skeptical of such a trite defense, and the Debtor presented no persuasive evidence to overcome the Court's initial skepticism. For the reasons stated below, the Court finds that the Debtor either (a) never wrote a check, or (b) wrote the check but later decided not to mail it. Under either circumstance, the Debtor's concealment of the existence of the tax refund satisfies the first five elements of fraud and deceit.

The monthly statement of the Debtor's Wells Fargo account shows check number 2099 as never having been cashed. The Debtor claims that check number 2099 is the check he wrote and mailed to Evelyn Presto. Merely showing that check number 2099 was not presented for payment does not support a finding that he actually wrote and mailed a check to Evelyn Presto.

The Debtor testified that he wrote four checks for the benefit of Evelyn Presto within several days of each other in late October 2005. Check number 2093, dated October 25, 2005, was written to Evelyn Presto in the amount of $30,000.00 as part of the property settlement in the Divorce Decree. This check was cashed on October 31, 2005. The Debtor wrote two $600.00 checks (numbers 2097 and 2098) to a state agency for disbursement to Evelyn Presto as child support. Both checks were dated October 28, 2005 and cashed on November 1, 2005. The Debtor testified that check number 2099 was written within a few days after checks 2097 and 2098. The earliest that the Debtor could have written check 2099 was October 31, 2005.[47] Check number 2100 is dated November 10, 2005. Thus, if check number 2099 was actually written to Evelyn Presto, it would have been written between October 31 and November 9, 2005.

The daily balance of the Wells Fargo account during this time period was as follows:

| Date | Balance |
| --- | --- |
| 10/31 | $11,494.95 |
| 11/01 | $ 9,365.09 |
| 11/02 | $ 8,890.79 |
| 11/03 | $ 5,608.22 |
| 11/04 | $ 5,550.74 |
| 11/07 | $ 5,467.66 |
| 11/08 | $ 5,044.09 |
| 11/09 | $ 4,880.09 |

At the end of November 2005, the balance was $3,063.06, and at the end of December 2005 it was $3,865.11. Thus, during the nine day period when check number 2099 could have been written, and the several months that followed, the account never had sufficient funds to clear a check for $12,284.00 (i.e., the amount due to Evelyn Presto as a result of the tax

---

47. The Court takes judicial notice of the fact that October 29, 2005 was a Saturday. The Debtor emphatically and repeatedly testified that he wrote and mailed all four of these checks from his place of work. Although it is conceivable that the Debtor was at work on that Saturday, it is more likely that the earliest date that check number 2099 could have been written was October 31, 2005, the next Monday.

refund). This fact also contradicts the Debtor's testimony that he was unaware that the $12,284.00 had not been withdrawn from his Wells Fargo account because of "sloppy" bookkeeping and the stress of the avoidance action litigation. If this account regularly had a substantial balance, it is conceivable that an uncashed check for $12,284.00 could go unnoticed. However, given that the balance in the account was less than the amount of the check, the Debtor's alleged oversight crosses the line into fraud.

The Debtor's testimony implied his awareness of this problem. On direct examination, counsel for the Debtor inquired why the allegedly missing check was not mailed in the same envelope as the other checks that were written to Evelyn Presto at approximately the same time. The Debtor responded, "I had [the tax refund check to Evelyn Presto] sitting in a separate envelope on my desk counter at my former employer and I just ... *I guess I was maybe worried about the funds in there or something* ... I don't know ... but it didn't get mailed on the same date." (emphasis added). This small slip of the tongue went largely unnoticed at trial, but the Debtor seemed to acknowledge that if he had written and mailed a check to Evelyn Presto for her half of the tax refund, the check would have been denied for insufficient funds. The Debtor also testified that he distinctly remembered writing these four checks because he "was not happy that [he] was writing checks for that amount of money to [his] ex-wife." The Court is left with only two possible conclusions: either the Debtor never wrote a check to Evelyn Presto, or the Debtor did write check number 2099 to Evelyn Presto but decided not to mail it.

Additionally, the Court has a lingering question regarding the Debtor's intent: if the Debtor intended to immediately write a check to Evelyn Presto for her half of the tax refund, why would he forge her name on both the tax return and the refund check? This is just one example of the Debtor's continuing concealment. The Divorce Decree clearly states that the parties must "cooperate" in the execution of any refund check. Without Evelyn Presto's knowledge or consent, the Debtor executed the tax return and the refund check. Under no circumstances would these actions be considered cooperation.

The Debtor's intentional concealment of the tax refund satisfies the first five elements of fraud. The remaining element is damages. Although the Debtor did not specifically address the element of damages, he did argue that he had, post-petition, paid the tax refund debt in full, and therefore did not owe a debt as required by § 522(q). In other words, the Debtor's argument is that Evelyn Presto was not damaged because she received full payment of her half of the tax refund.

The Debtor asserts that "owes," as used in § 522(q)(1)(B), indicates that the debt in question must exist at the time that an objection to exemption is filed. It is undisputed that the Debtor paid Evelyn Presto the complete balance owed from the tax return by a check dated February 10, 2007, which was deposited by Evelyn Presto on February 20, 2007. The Committee filed the Supplemental Objection, asserting an objection under § 522(q) for the first time, on February 16, 2007. Thus, the Debtor asserts that his payment of the debt to Evelyn Presto prior to the Committee filing the Supplemental Objection precludes the application of § 522(q) because he did not owe any debt related to the tax return on the date that the Committee first objected under § 522(q).

Section 522(q) has both a deterrent and punitive effect. The statute sends a message to debtors who have violated securi-

ties law or other fiduciary duties, or caused serious physical injury to another: not only will such debts not be discharged in bankruptcy, but homesteads may be in jeopardy due to the actions giving rise to these debts. Under the Debtor's interpretation, a debtor can conceal such debts by not scheduling or otherwise disclosing them and, after such debts are uncovered, avoid the impact of § 522(q) by simply paying off that debt.[48] The Debtor's reading of § 522(q) would eviscerate the effect of the statute. The Court finds that the better policy is to not allow post-petition payment of a debt described in § 522(q)(1)(B) to terminate a debtor's liability under the statute. In sum, the Court interprets "owes," as it is used in § 522(q)(1)(B), to mean that the debt was owed on the date of the petition without regard to any payments on the debt that were made post-petition.

The Court's reading is consistent with the Fifth Circuit's rule that "the right to exemptions is determined by facts as they existed on the date of the original bankruptcy petition." *Lowe v. Sandoval (In re Sandoval)*, 103 F.3d 20, 23 (5th Cir.1997) (citations omitted); *see also Zibman*, 268 at 302. The effect of § 522(q) is to limit a debtor's homestead exemption. If the right to an exemption is determined on the petition date, then whether a debt is owed for purposes of § 522(q) should be viewed on that same date. The Debtor does not dispute that he owed a debt to Evelyn Presto on the petition date, and therefore it is appropriate for the Court to apply § 522(q) to his claimed homestead exemption.

The same analysis applies to the issue of damages, which must be determined on the petition date and not the date that the objection to exemption was filed. The Court finds that the element of damages is present because, on the petition date, the Debtor was still concealing the existence of the tax refund from Evelyn Presto. On the petition date, Evelyn Presto's damages were the full $12,284.00 that she was owed. The fact that the Debtor fully paid this debt post-petition has no bearing on whether damages existed on the petition date. Thus, all the elements of fraud or deceit have been satisfied.

### b. Manipulation in a fiduciary capacity

Manipulation is not defined in the Code and the Court is unaware of any state law or federal common law cause of action for manipulation. As discussed above, the securities law definition relates to actions taken with the intent to alter market perceptions and has no application to the fiduciary duty in this case. The Court therefore looks to the common meaning of the word.[49]

The most applicable dictionary definition of manipulation is "to change by artful or unfair means so as to serve one's purpose." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 706 (10th Ed.2001). This definition establishes a much lower standard of proof than common law fraud, and the facts described above under the fraud analysis also satisfy manipulation. Concealing the existence of the tax refund from Evelyn Presto in violation of the terms of the Divorce Decree is

---

**48.** In the case at bar, the Debtor did not schedule this debt. The Debtor testified that the first time he realized this debt was still owed to Evelyn Presto was when he was preparing documents in response to the Committee's discovery request; in other words, after litigation had begun.

**49.** The only definition in Black's Law Dictionary is the securities law usage. BLACK'S LAW DICTIONARY 975 (7th Ed.1999).

serving one's own purpose by "unfair means." The Debtor did not send Evelyn Presto the money because, as he testified, he was unhappy about giving so much money to his ex-wife, or, as evidenced by his Wells Fargo account statements, he had already spent the funds and could not afford to send her a check for that amount. Both circumstances would serve the Debtor's own purpose. Thus, the Court finds that the Debtor's concealment was manipulation in a fiduciary capacity.

### 4. The Debtor's Necessity Defense

Section 522(q)(2) provides that:

Paragraph (1) shall not apply to the extent the amount of an interest in property described in subparagraphs (A), (B), (C), and (D) of subsection (p)(1) is *reasonably necessary* for the support of the debtor and any dependent of the debtor (emphasis added).

The Debtor argued that the Royal Rose Property is "reasonably necessary" for his and his children's support. The Debtor testified that the pool on the Royal Rose Property is a medical necessity due to his severe arthritic condition. Without doing exercises and stretches in his pool and spa, the Debtor contends, his pain is so insufferable that he would not be able to go to work. The Court rejects the Debtor's defense because § 522(q)(2) is not focused on the necessity of the real property itself; rather, the test under § 522(q) is whether the *equity* in the homestead is reasonably necessary for the support of the Debtor or his children. Earlier, the Court discussed the meaning of "amount of an interest" as used in § 522(p) and held that the phrase "amount of" preceding the word "interest" meant that the interest must be quantified by a monetary figure, i.e. equity in the homestead. Thus, when the statute states that "Paragraph (1) shall not apply to the extent the amount of an interest in property described in subparagraphs (A), (B), (C), and (D) of subsection (p)(1) is reasonably necessary for the support of the debtor," the Court must determine if the equity in the homestead is necessary for the Debtor's support.

The Court draws its analysis of the § 522(q)(2) exception from cases interpreting the phrase "reasonably necessary for the support of the debtor" in §§ 522(d)(10) and (11). "Determination of the quantum that is needed for support is entrusted to the sound discretion of the bankruptcy court." *Carmichael v. Osherow (In re Carmichael)*, 100 F.3d 375, 380 (5th Cir.1996). "The 'reasonably necessary' standard requires that the Court take into account other income and exempt property of the debtor, present and anticipated, and that the appropriate amount to be satisfied for the debtor ought to be sufficient to sustain basic needs, not related to his former status in society or the lifestyle to which he is accustomed, but taking into account the special needs of the debtor." *In re Grant*, 40 B.R. 612, 613–14 (Bankr.N.D.Tex.1984) (citing *In re Taff*, 10 B.R. 101, 107 (Bankr.D.Conn.1981)); *see also In re Goff*, 706 F.2d 574, 580 n. 15 (5th Cir.1983) (reversed on other grounds) (citing *In re Kochell*, 26 B.R. 86 (Bankr. W.D.Wis.1982)) (listing age, health, future earnings capacity, and necessary expenditures as factors for the court to consider).

The Court finds that the Debtor's equity in the Royal Rose Property is not reasonably necessary for his and his children's support. The Debtor is currently employed by Bear Energy, a subsidiary of Bear Stearns Companies Inc. He makes an annual salary of $175,000.00 and, pursuant to the terms of his employment agreement, is guaranteed a bonus of $100,000.00 after his first year of employment. In addition to the generous base salary, the Debtor has the ability to earn more bonuses in the

future. The Debtor seems to be stubbornly holding on to his previous lifestyle in the heady days of pre-bankruptcy Enron.[50] Is it *reasonably* necessary for the Debtor, whose children only stay with him during the summer, to live in a two-story 3400 square foot house in a gated community with a country club? Surely not. Such a lifestyle for a single man far exceeds his "basic needs." Even assuming that the Debtor was truthfully testifying about his medical need for a pool, § 522(q)(2) would not protect the Royal Rose Property.[51] The only question this condition would raise is whether the Debtor has sufficient income and other assets to afford *any* house, not this specific house, that can provide a pool. In Houston, Texas in the year 2007, there are ample living options that include a pool for far less than $521,800.00. Thus, in light of the Debtor's substantial income and future earning capacity, the Court finds that the equity in the Royal Rose Property is not reasonably necessary for the support of the Debtor and his children.

In conclusion, the Court finds that the Royal Rose Property is not protected by § 522(q)(2). Therefore, § 522(q)(1)(B)(ii) applies to limit the amount of interest the Debtor may exempt in his homestead.

### 5. Calculation of the Non–Exempt Portion of the Royal Rose Property under § 522(q)

Unlike §§ 522(*o*) and (p), each of which requires the current market value to calculate the exempt amount, § 522(q) does not require the precise current market value of the Royal Rose Property to calculate the exempt amount. The Court's finding that the Debtor owes a debt arising from the conduct described in § 522(q)(1)(B) means that the Court does not need to calculate the non-exempt value of the homestead; the Debtor retains a monetary exemption in the amount of $125,000.00

---

50. For example, the Debtor testified that he purchased five televisions for the Royal Rose Property sometime during the three months preceding the petition date—a time when the Debtor was in contemplation of bankruptcy and negotiating to settle the Committee's $2 million judgment. Counsel for the Committee asked the Debtor why, as a single person, he needed so many televisions. The Debtor responded that his home had that many rooms that needed televisions—media room, family room, game room, master bedroom and guest room. This is just one of many examples presented at trial of the Debtor's cavalier spending in the months preceding his Chapter 7 petition.

51. There are two reasons to doubt the veracity of the Debtor's testimony about the severity of his condition. First, no expert testimony was adduced regarding this condition. *See Foster v. Johnson*, 293 F.3d 766, 773 (5th Cir.2002). Second, an email from the Debtor to his homeowners' association, introduced into evidence by the Debtor for other purposes, casts serious doubt on the severity of his ailment. This email, sent just two days before the closing on the Royal Rose Property, was a request by the Debtor to expedite the approval process for the construction of the pool at the Royal Rose Property. The Debtor did not mention his medical condition in this email. He did not explain to the association that he would be disabled with pain if he could not use this pool or that his request for expedited consideration was made because of a medical necessity. Instead, the email focuses solely on the Debtor's desire to complete the pool early for the sake of his children. He wrote, "I want my children to be happy with their situation and be excited about having a slide, hot tub, nice pool, etc. to use in their backyard for as much of the summer as possible. *If I didn't have my beautiful young children to please, I would not be asking for accelerated approval*, but please understand (like all good Daddy's [sic]), I want to put a big smile on my children all summer." (emphasis added). If the Debtor's medical condition is really as painful as he testified, and if he really needed the pool to alleviate this pain, then it strains credulity that he would not mention his condition to the association in order to expedite the approval process.

and any amount exceeding $125,000.00 is property of the estate. Accordingly, the Court sustains the Committee's Objection to the extent that any value in the Royal Rose Property exceeds $125,000.00.[52]

## VII. Conclusion

The Court sustains the Committee's Objections to the Debtor's homestead exemption under § 522(*o*) in the amount of $28,200.00; under § 522(p) in the amount of $105,000.00; and under § 522(q) to the extent that the value of the Royal Rose Property exceeds $125,000.00. The Court considered, but rejected, combining the Committee's objection under § 522(*o*) with its objections under § 522(q)—i.e., reducing the Debtor's homestead exemption to $125,000.00 under §§ 522(q) and then deducting the $28,200.00 for which the Debtor is liable under § 522(*o*).[53] Combining the Committee's objections in this way would undermine Congress' intent to allow a minimum homestead exemption under §§ 522(p) and (q) of $125,000.00.[54] Instead, the Court sustains the Committee's Objection under § 522(q), which renders the property non-exempt but allows the Debtor to retain a $125,000.00 interest. Alternatively, if the Court's interpretation of § 522(q) is incorrect, the Court sustains the Committee's Objection under § 522(p) in the amount of $105,000.00. Finally, if the Court is also incorrect in its interpretation of § 522(p), then the Court sustains

the Committee's Objection under § 522(*o*) in the amount of $28,200.00.

In *Sissom*, the Court sustained the Trustee's objection under § 522(*o*) in the amount of $50,000.00. *Sissom*, 366 B.R. at 705. To ensure recovery of these funds, the Court granted the Trustee an equitable lien of $50,000.00 against the debtor's homestead. *Id.* (citing *In re Keck*, 363 B.R. 193 (Bankr.D.Kan.2007)). In the case at bar, an equitable lien in favor of the Trustee is not necessary because of the differences in language between § 522(*o*) and § 522(q).

Section 522(*o*) requires that the value of a debtor's homestead exemption "shall be reduced to the extent such value is attributable" to any nonexempt property fraudulently disposed of within the last ten years. At least in the state of Texas, with its unlimited homestead exemption as to value, if an objection under § 522(*o*) is sustained, the debtor retains possession of his homestead as exempt property, but will be liable to the estate for any amounts that satisfy the elements of § 522(*o*). Conversely, § 522(q) states that if a debt is owed due to the actions described in the statute, "a debtor may not exempt any amount of interest . . . which exceeds in the aggregate $125,000." Congress apparently intended that, if an objection is sustained under § 522(q), the claimed homestead is property of the estate, and the debtor's allowed interest in the property is

---

**52.** The Debtor scheduled the Royal Rose Property as having a value of $550,000.00 and testified that it had a value of $521,800.00. Whatever the actual current market value of the Royal Rose Property is, it exceeds $125,000.00.

**53.** Whereas §§ 522(p) and (q) allow the Debtor to retain an exemption in the first $125,000.00 of equity in his homestead under any circumstances, Section 522(*o*) allows an absolute reduction to the homestead exemp-

tion and does not reference any base amount that the Debtor may exempt.

**54.** However, if the Debtor was liable under § 522(*o*) alone for an amount that exceeded the amount sustained under §§ 522(p) or (q), then the Court would instead sustain the objection under § 522(*o*). This would not be a case of combining multiple objections; rather the objection would be sustained under § 522(*o*) because it was the largest amount of the objections.

limited to the first $125,000.00. In short, under § 522(*o*), the Royal Rose Property is the Debtor's exempt property subject to the amount of the lien held by the Trustee; but under § 522(q), the Royal Rose Property is the estate's property subject to the Debtor's interest in the first $125,000.00.[55]

Accordingly, since the Court has found that the Committee has satisfied the elements of an objection under § 522(q), the Royal Rose Property is property of the Debtor's Chapter 7 estate, subject to the Debtor's allowed exemption of $125,000.00. In *Sissom*, the Court granted the Trustee an equitable lien because the debtor retained ownership of his homestead, but was liable to the Trustee, under § 522(*o*), for $50,000.00. In the case at bar, the Court does not need to grant the Trustee an equitable lien on the Royal Rose Property because the Royal Rose Property is owned by the estate and not the Debtor.

55. Even if this Court, out of deference to Texas' longstanding tradition of favoring homesteads, wanted to allow the Debtor to keep the Royal Rose Property as his homestead and merely grant the Trustee a lien on this property, the Court could not do so in light of the indefiniteness of the recovery under § 522(q). A lien may only be granted in a specific amount. It is not possible to grant the Trustee a lien under § 522(q) because the recovery for the estate is unknown until the property is actually sold and the first $125,000.00 is paid to the Debtor.